S07A0385. GRIFFIN v. THE STATE.
(647 SE2d 36)

SEARS, Chief Justice.

The appellant, Michael Griffin, appeals from convictions in the Superior Court of Thomas County for malice murder and kidnapping

with bodily injury stemming from the death of Jenny Rhames.[1] On appeal, Griffin contends, among other things, that the evidence is insufficient to support his convictions, that the trial court erred in denying his motion for change of venue, and that the trial court erred in denying his motion to dismiss for lack of a speedy trial. Finding no merit to Griffin's contentions, we affirm his convictions.

1. The victim and Griffin shared a home together in Thomasville, Georgia, for a number of years, during which time they had two children. The couple eventually separated, and in April 1991, the victim moved into her own trailer in Thomasville. Meanwhile, Griffin had begun dating a woman who lived in McIntosh County, Georgia, about 170 miles from Thomasville.

The State introduced evidence that on Saturday, June 29, 1991, Griffin drove to McIntosh County with his two children and with the victim's 14-year-old sister. At that time, Griffin was taking care of his two children, with the help of the victim's sister, because the victim was going to Florida that same day to take care of another sister who had been seriously injured in an automobile accident on June 18, 1991. When Griffin arrived in McIntosh County, he stayed at his girlfriend's house. On Monday, July 1, Griffin left his children and the victim's 14-year-old sister with his girlfriend in McIntosh County, and returned to Thomasville. The victim's mother, who was in Florida with the victim and the victim's injured sister, testified that the victim returned to Thomasville, Georgia, on Sunday, June 30, but that she was planning to return to Florida after work on July 2.

---

[1] The crimes occurred on the night of July 2-3, 1991. Griffin was first indicted in McIntosh County in 1992 for malice murder. That same year, because the jury could not agree on a verdict, the trial court declared a mistrial. Griffin contended that his subsequent trial in McIntosh County was barred by double jeopardy, but this Court disagreed. *Griffin v. State*, 264 Ga. 232 (443 SE2d 612) (1994) (*Griffin I*). While the appeal in *Griffin I* was pending, Griffin was indicted in Thomas County for malice murder and kidnapping with bodily injury. The Thomas County Superior Court denied Griffin's motion to quash that indictment, but this Court reversed, *Griffin v. State*, 266 Ga. 115 (464 SE2d 371) (1995), ruling that Thomas County was preempted from exercising jurisdiction based on the pending McIntosh County prosecution. McIntosh County eventually nolle prossed its indictment. On February 15, 1996, Griffin was reindicted in Thomas County for malice murder and kidnapping with bodily injury, and the State sought the death penalty. Griffin filed a plea in bar contending that OCGA § 17-7-53.1 barred his prosecution in Thomas County. The trial court granted the motion, but this Court reversed. *State v. Griffin*, 268 Ga. 540 (491 SE2d 340) (1997). Griffin was tried by a jury in Thomas County in August 1999. On August 25, 1999, the jury found Griffin guilty on both counts of the indictment. On August 26, 1999, the jury returned its sentencing verdict, fixing the sentence as life in prison. That same day, the trial court sentenced Griffin to life in prison on the malice murder conviction and to a consecutive life sentence for the kidnapping conviction. On September 20, 1999, Griffin filed a motion for new trial, and on April 19, 2006, the trial court denied Griffin's motion for new trial. On May 11, 2006, Griffin filed a notice of appeal, and on November 20, 2006, the case was docketed in this court. The case was subsequently submitted for decision on briefs.

Several witnesses testified that, because the victim was going to return to the hospital in Florida on the night of July 2, Griffin was going to keep the victim's dog in the pen behind his trailer while she was away. According to one witness, Griffin was supposed to come by the victim's place of work on July 2 and pick up her dog there, but he did not come. A neighbor of Griffin's testified that she saw the victim driving to Griffin's trailer about 8:30 to 8:45 p.m. on Tuesday, July 2. The victim's mother testified that the victim did not arrive in Florida on the night of July 2, as planned.

On the afternoon of July 3, 1991, Griffin's trailer burned to the ground. The victim's car was found in front of the home, with the keys in the ignition. The car, however, would not start because a coil wire was disconnected. There was also evidence that a lawn mower with the gas cap removed was near the back steps of the trailer and that a five-gallon gas can was on the top step. Several witnesses testified that there were burn patterns in an irregular shape on the top step and the back porch, and that the burn pattern was consistent with a burn from a flammable liquid. No human remains were found in the trailer, and the victim could not be located.

On July 5, 1991, Griffin told the police that he had removed the coil wire from the victim's car because he did not want the victim to leave on the evening of July 2. Griffin also told the police that he left the trailer about 4:00-5:00 a.m. on July 3; that the victim was in the trailer cooking; that he drove to his girlfriend's house in McIntosh County; and that he had obtained permission from his boss to be off work that day. Griffin's boss, however, testified that Griffin had not asked for the day off, and another witness who knew Griffin well testified that she saw Griffin at a gas station in Thomasville about 8:00 a.m. on July 3. One of the police officers who spoke with Griffin on July 5 testified that the top of Griffin's knuckles were busted and had fresh scars.

Several witnesses testified that Griffin returned to McIntosh County late in the afternoon on July 3, and that he looked extremely tired and appeared to have a fever. After the victim's mother called Griffin on July 4 telling him that his trailer had burned and that the victim was missing, Griffin told his girlfriend and his children that he was leaving McIntosh County to drive back to Thomasville. Although Griffin drove off in his truck, he did not drive to Thomasville, but returned to his girlfriend's home.

Jacob Yorkey, an inmate who was in jail with Griffin following his arrest, testified that Griffin told him that the victim had come to his trailer to drop off her dog; that he disconnected the coil wire in her car; that he and the victim then went back into the trailer and had an argument; that she told Griffin to fix her car and that she would walk from his house if she had to; that Griffin did not like that statement;

and that Griffin then "got her into the house" where they got into a big argument that resulted in Griffin hitting the victim. Yorkey added that Griffin told him that the victim hit her head when she fell and died. According to Yorkey, Griffin told him that he attempted to cut up the victim's body; that he (Griffin) torched his trailer because there was blood everywhere; that he had used a gas can to burn his bloody clothes and the trailer; and that he had used a hatchet and an axe to cut the victim's body.

Several of the victim's family and friends testified that they frequently saw bruises on the victim and that the victim told them that Griffin had caused the bruises. These same family members and friends also testified that, in April 1991, they saw the victim with bruises; that the victim was trembling and shaking; and that the victim told them that Griffin had beaten and raped her.

Moreover, Bonnie Miles, who was a friend of the victim's sister, testified that about June 15, 1991, she was at a bar in Florida with the victim, Griffin, and the victim's sister. She added that they discussed the difficulties that Griffin and the victim were having; that the victim's sister told Griffin that the victim was leaving him; and that Griffin responded by stating that, if "that stupid bitch leaves and takes my kids with her, I will cut her fucking throat." According to Miles, the victim's sister then told Griffin that he had better not hurt her sister, and that Griffin then stated that "I will do one better. I'll cut her fucking head off." Miles testified that the victim's sister left the table; that Miles told Griffin to "leave it alone"; and that Griffin stated that the victim was his "bitch and ain't nobody else going to have her."

Rhonda Black, the victim's first cousin, testified about seeing bruises on the victim, and testified that, in November 1990, Griffin showed her a knife that was 10-12 inches long and told her that it would be a perfect murder weapon. Black also testified that, on May 24, 1991, she spent the night at the victim's trailer; that about midnight, she heard banging on the door and heard Griffin's voice; that Griffin yelled that if the victim had a man in the house he would kill her; that Griffin threw a letter in the trailer; that she was familiar with Griffin's voice and handwriting; that the letter to the victim was threatening; and that she saw Griffin's truck parked on the road by the victim's driveway. Rhonda also testified that at a child custody hearing in May 1991, she heard Griffin threaten to kill the victim.

In October 1991, the skeletal remains of the victim were found by a hunter in an isolated part of McIntosh County, Georgia, about ten miles from the home of Griffin's girlfriend. The victim had been decapitated, and her head was never found. Also, the victim's body had been burned with the use of a rubber inner tube.

(a) Although Griffin contends that the evidence is insufficient to support his conviction for malice murder, a review of the evidence in the light most favorable to the verdict shows that a rational trier of fact could have found Griffin guilty beyond a reasonable doubt for the malice murder of the victim.[2]

(b) As for Griffin's contention that the evidence is insufficient to support his conviction for kidnapping with bodily injury, he specifically contends that the evidence is insufficient to show asportation of the victim. For the reasons that follow, we disagree.

The requirement of asportation is satisfied if there is movement of the victim, however slight.[3] Here, there is evidence from which the jury could infer that Griffin forced the victim to move from her car into the house where he killed her. In this regard, Yorkey, Griffin's fellow inmate, testified that Griffin told him that when the victim arrived at his house he disconnected the coil in her car; that they went into the house and got into an argument; and that the victim stated that she wanted her car fixed and would walk back home if she had to. According to Yorkey, Griffin stated that he then "got [the victim] in the house" where he then hit her. We conclude that this is sufficient evidence by which a rational trier of fact could have found that Griffin wanted the victim to remain at his house, and that he accomplished this goal by removing the coil wire from her car and persuading her to go back inside instead of walking away.[4]

Griffin also contends that the evidence is insufficient to support his conviction for kidnapping with bodily injury because there was no evidence that the bodily injury that was alleged in the indictment — that the victim's arm was cut — occurred before death.[5] Although we agree that there is no evidence showing that the alleged injury to the victim occurred before death, we do not agree with Griffin that the victim had to receive the injury before death before he may be convicted of kidnapping with bodily injury. In *Lipham v. State*,[6] we concluded that there was nothing in the rape statute that precluded "a finding of rape if the victim is not alive at the moment of penetration," and we affirmed Lipham's conviction for rape even though he had killed the victim before the act of penetration. Similarly, in the

---

[2] *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

[3] *Leppla v. State*, 277 Ga. App. 804, 806-809 (627 SE2d 794) (2006); Kurtz, Criminal Offenses and Defenses in Georgia (2006 ed.), p. 882.

[4] *Harshaw v. State*, 222 Ga. App. 385, 386 (474 SE2d 226) (1996), overruled on other grounds in *Woodson v. State*, 273 Ga. 557, 558 (544 SE2d 431) (2001) (" 'An abduction or taking by inducement, persuasion, or fraud can also support a finding of asportation.' ").

[5] See *Lewis v. McDougal*, 276 Ga. 861, 864 (583 SE2d 859) (2003) (jury not authorized to convict a defendant of kidnapping with bodily harm based on injuries other than those alleged in the indictment).

[6] 257 Ga. 808, 809-810 (364 SE2d 840) (1988).

present case, we conclude that OCGA § 16-5-40 does not preclude a conviction for kidnapping with bodily injury if the bodily injury occurs after the victim is dead.[7] Accordingly, we affirm Griffin's conviction for kidnapping with bodily injury.

2. Griffin contends that the trial court erred in denying his motion for change of venue. For the reasons that follow, we disagree.

To prevail on a motion for change of venue, a defendant "must prove that his trial setting was inherently prejudicial due to pretrial publicity or that there was actual bias on the part of individual jurors" arising from that publicity.[8] A trial court has discretion to determine whether a defendant has demonstrated the required prejudice to support a change of venue, and the trial court's exercise of that discretion will not be disturbed on appeal unless it is abused.[9]

In the present case, the record supports the trial court's finding that much of the publicity in question predated Griffin's trial by many years and was neutral in tone, "rather than unnecessarily inflammatory and slanted."[10] We thus conclude that Griffin's trial setting was not inherently prejudicial due to pretrial publicity. Moreover, having examined the record, we conclude that, "in light of the exacting standard applied by the trial court in reaching its decision to excuse certain jurors," the trial court did not abuse its discretion in finding that the number of excusals for bias due to pretrial publicity "[was] not indicative of the kind of inherently prejudicial environment requiring a change of venue."[11]

3. Although Griffin contends that the trial court engaged in improper rehabilitation of several prospective jurors, our review of the voir dire testimony of the potential jurors in question does not reflect that they had "formed an opinion on the guilt or innocence of appellant that was so fixed and definite that [they] would be unable

---

[7] See *Lamunyon v. State*, 218 Ga. App. 782, 785 (463 SE2d 365) (1995) (approving of jury instruction that kidnapping with bodily injury occurs if the injury occurs as a result of the kidnapping).

[8] *Thomason v. State*, 281 Ga. 429, 434 (637 SE2d 639) (2006). Accord *Perkinson v. State*, 279 Ga. 232, 234-235 (610 SE2d 533) (2005); *Gissendaner v. State*, 272 Ga. 704, 706 (532 SE2d 677) (2000).

[9] *Butts v. State*, 273 Ga. 760, 764-765 (546 SE2d 472) (2001); *Dixson v. State*, 269 Ga. 898, 899 (506 SE2d 128) (1998).

[10] *Roundtree v. State*, 270 Ga. 504, 505 (511 SE2d 190) (1999). Accord *Dixson*, 269 Ga. at 898-899 (trial court did not abuse its discretion in finding that pretrial publicity was factually correct, non-inflammatory and did not reflect an atmosphere of hostility).

[11] *Gissendaner*, 272 Ga. at 707. In this regard, we note that some of the jurors that Griffin alleges were excused for bias arising from pretrial publicity were not in fact excused for that reason. For example, Juror Hart was not excused for bias arising from publicity but from his opposition to the death penalty. In addition, another juror was not excused for bias from pretrial publicity but from bias arising from the fact that her daughter had been the victim of an attempted murder by her husband.

to set the opinion aside and decide the case based upon the evidence or the court's charge upon the evidence."[12] "Thus, there is no merit in [Griffin's] contention that the trial court engaged in an improper 'rehabilitation' " of the jurors in order to "reject clear evidence of potential juror's bias."[13]

4. Griffin contends that the trial court erred in denying his motion to dismiss based on an alleged violation of his constitutional right to a speedy trial. We disagree. Because the various appeals by Griffin and the State constitute valid reasons for significant periods of the delay in Griffin's trial,[14] because part of the delay was inherent in the death penalty prosecution in Thomas County,[15] because "there is simply no evidence of a deliberate attempt by the State to delay the trial in order to hamper the defense,"[16] and because the trial court was authorized to conclude that there had not been any impairment to Griffin's defense,[17] which is the most important factor in deter-mining prejudice to a defendant,[18] we conclude that the trial court did not err in denying Griffin's motion to dismiss for lack of a speedy trial.[19]

5. Griffin contends that the trial court erred in denying his motion to dismiss the indictment based on the alleged violation of his constitutional right to a speedy indictment under the Sixth Amend-ment. Although there is language in *Harris v. Hopper*[20] indicating that there is a Sixth Amendment right to a speedy indictment, the United States Supreme Court has ruled that there is no such right,[21] and this Court, after *Harris*, has acknowledged the Supreme Court's rulings.[22] Although a defendant may have a due process claim arising

---

[12] *Ros v. State*, 279 Ga. 604, 606 (619 SE2d 644) (2005).

[13] Id.

[14] See 4 LaFave, Criminal Procedure § 18.2 (c) (2d ed. 1999).

[15] See generally *Wimberly v. State*, 279 Ga. 65, 66-67 (608 SE2d 625) (2005) (delay associated with prosecuting a death penalty case, which triggers Unified Appeal Procedures, led this Court to conclude that the delay in that case was not presumptively prejudicial).

[16] *Thomas v. State*, 274 Ga. 492, 494 (555 SE2d 693) (2001).

[17] Griffin's girlfriend, who was a State's witness at Griffin's McIntosh County trial, died before the trial in Thomas County. Two prosecutors and the defense attorney participated in reading the transcript of her testimony, including the direct and cross-examinations, from the McIntosh County trial into the record in the Thomas County trial. Griffin has not demonstrated how he was harmed by her absence at the Thomas County trial, and the trial court was authorized to find that, in light of the foregoing procedure, Griffin was not harmed by her absence.

[18] *Christian v. State*, 281 Ga. 474, 477 (640 SE2d 21) (2007).

[19] *Williams v. State*, 279 Ga. 106, 110 (610 SE2d 32) (2005).

[20] 236 Ga. 389 (224 SE2d 1) (1976).

[21] *United States v. Lovasco*, 431 U. S. 783 (97 SC 2044, 52 LE2d 752) (1977); *United States v. Marion*, 404 U. S. 307 (92 SC 455, 30 LE2d 468) (1971).

[22] *Moore v. State*, 278 Ga. 473, 474 (604 SE2d 139) (2004); *State v. Madden*, 242 Ga. 637 (250 SE2d 484) (1978).

from a significant pre-indictment delay, "these due process rights were not distinctly asserted [by Griffin] in the trial court or considered and ruled on therein" and therefore "will not be addressed for the first time on appeal."[23]

6. Griffin contends that the trial court erred in permitting the State to introduce hearsay testimony regarding out-of-court statements by the victim to the effect that Griffin had raped her on one occasion and beaten her on that occasion and others. We conclude, however, that the trial court did not err in admitting the hearsay statements. First, the victim was unavailable to testify due to her death and the hearsay statements were more probative on the rape and other difficulties than other evidence that the State could have produced.[24] In the latter regard, although several witnesses testified that they heard Griffin threaten the victim, they did not see or hear about the rape and the bruises. Moreover, because the statements were made to her relatives and friends that the victim confided in, the statements carried particularized guarantees of trustworthiness.[25] Finally, " '[t]he determination of trustworthiness is inescapably subjective and the trial court's determination of the issue will not be disturbed absent an abuse of discretion.' "[26] In the present case, we cannot conclude the trial court abused its discretion in concluding that the statements in question were trustworthy.

7. Contrary to Griffin's contention, we conclude that the trial court did not err in admitting evidence of prior difficulties between Griffin and the victim.[27]

8. Griffin contends that the trial court erred in failing to give his written request for a limiting instruction on the use of prior difficulty evidence on each occasion that such evidence was offered.

In *Wall v. State*,[28] we held that "the admission of [prior difficulties] evidence should be accompanied by an instruction from the trial judge explaining the limited use to which the jury may put such evidence,"[29] and in the present case, Griffin requested that the trial court give such an instruction each time the State offered prior

---

[23] *Moore*, 278 Ga. at 474.

[24] *Turner v. State*, 281 Ga. 647, 650 (641 SE2d 527) (2007).

[25] Id.

[26] Id., quoting *Watson v. State*, 278 Ga. 763, 765 (604 SE2d 804) (2004).

[27] See *Clark v. State*, 279 Ga. 243, 246 (611 SE2d 38) (2005); *Williams v. State*, 277 Ga. 853, 855 (596 SE2d 597) (2004) (evidence of prior difficulties between defendant and victim admissible to show motive, intent, and bent of mind).

[28] 269 Ga. 506 (500 SE2d 904) (1998).

[29] Id. at 509.

difficulty evidence.[30] However, because the trial court gave a limiting instruction before most occasions on which the State offered prior difficulty evidence, as well as in its final charge to the jury, because the majority of prior difficulty evidence concerned the alleged rape and beating of the victim in April 1991, because the jury was adequately instructed regarding this evidence on most occasions, and because the evidence against Griffin was overwhelming, we conclude that, even if the trial court erred in failing to inform the jury about how to consider such evidence on a few occasions, the error was harmless.[31]

9. Because "the fact that the indictment did not set out facts showing how [Griffin] caused [the victim's] death does not render the indictment insufficient,"[32] the trial court did not err in denying Griffin's special demurrer to the indictment.

10. We conclude that the State laid a proper foundation for the admission of an audiotape of a telephone conversation between the victim and Griffin, and that the trial court thus did not err in admitting the tape into evidence.[33] Contrary to Griffin's contention, the evidence adequately demonstrates that the victim was the person who made the tape, and, as she was a party to the conversation, the tape was not inadmissible under OCGA § 16-11-62.[34]

*Judgment affirmed. All the Justices concur.*

DECIDED JUNE 25, 2007.

*Thomas L. Kirbo III, Allen & Forehand, Jon V. Forehand,* for appellant.

*J. David Miller, District Attorney, Robert R. Auman, Assistant District Attorney, Thurbert E. Baker, Attorney General, Robin J. Leigh, Assistant Attorney General,* for appellee.

---

[30] See *Laney v. State,* 271 Ga. 194, 196 (515 SE2d 610) (1999) ("In the absence of a request, it cannot be said that the trial court erred in failing to give contemporaneous instructions with regard to the state's evidence of prior difficulties.").

[31] *Griffith v. State,* 264 Ga. 326, 327 (444 SE2d 794) (1994).

[32] *Hinton v. State,* 280 Ga. 811, 815 (631 SE2d 365) (2006).

[33] See OCGA § 24-4-48 (a) (4).

[34] *Fetty v. State,* 268 Ga. 365, 367 (489 SE2d 813) (1997).