## S07G1628. GARZA v. THE STATE.

(670 SE2d 73)

HUNSTEIN, Presiding Justice.

Appellant Joey Allen Garza was convicted in March 2002 of two counts of kidnapping, four counts of false imprisonment, and one count of aggravated assault. Following affirmance of the convictions by the Court of Appeals, *Garza v. State,* 285 Ga. App. 902 (648 SE2d 84) (2007), Garza sought a writ of certiorari. We granted the writ to assess the sufficiency of the evidence as to the asportation element of the crime of kidnapping. Having set forth below a new standard for asportation, we now reverse Garza's kidnapping convictions.

As recited in the opinion below, the evidence at trial established that

> on the evening of October 16, 2001, Garza gained entry into Angela Mendoza's residence on the pretext that he had left his wallet in her van. Once inside and while Mendoza's three children slept, he locked the door, drew a handgun from his pants, placed the weapon against Mendoza's head, and threatened to shoot her if she failed to follow his instructions. Garza struck Mendoza in the head with the handgun as she attempted to push it aside, causing her to fall to the floor. Garza then bound Mendoza's wrists with electrician's tape, tied her ankles with a torn sheet, and helped her up, made her sit in a chair, and instructed her not to move. Later, Garza allowed Mendoza to move to the floor where she joined her infant daughter and feigned

sleep. When Garza fell asleep, Mendoza and her two-year-old son escaped out of a window, and Mendoza called the police.

Upon their arrival, the police forcibly entered the locked residence, removed Mendoza's infant daughter from the premises, and negotiated the release of Mendoza's nine-year-old son, J. M., for a six-pack of beer. . . . [A]s the police entered the residence, Garza awoke J. M., asked him if he wanted to play cops and robbers, and, while holding his shirt, ordered him to move to the back bedroom of the residence. Once there, Garza continued to restrain J. M. by his shirt while openly holding his handgun. Although Garza did not point the weapon at him, J. M. was "scared" because he believed the weapon had been used to kill his mother.

*Garza v. State*, supra, 285 Ga. App. at 902-903. The issue presented is whether any of the movements of either Mendoza or J. M. during the course of the incident — Mendoza's falling to the floor from a standing position or being forced from the floor to a chair,[1] or J. M.'s being forced from the room where he slept into an adjacent bedroom — constituted asportation within the meaning of the Georgia kidnapping statute.

1. "A person commits the offense of kidnapping when he abducts or steals away any person without lawful authority or warrant and holds such person against his will." OCGA § 16-5-40 (a). Under current Georgia jurisprudence, the element of "abduct[ing] or steal-[ing] away" the victim, known in legal parlance as "asportation," may be established by proof of "movement of the victim, however slight." *Griffin v. State*, 282 Ga. 215, 219 (1) (647 SE2d 36) (2007). Thus, in addition to the more traditional scenarios involving child abduction or kidnapping for ransom, situations involving some other form of criminal activity have been found to support kidnapping charges even though the movement of the victim was merely a minor incident to the primary offense. See, e.g., *Woodson v. State*, 273 Ga. 557 (544 SE2d 431) (2001) (evidence of asportation sufficient where victim forced from one room to another in course of attempted rape); *Scott v. State*, 288 Ga. App. 738 (1) (b) (655 SE2d 326) (2007) (evidence of asportation sufficient where victim dragged ten feet from bus stop to bushes in course of robbery); *Phillips v. State*, 259 Ga. App. 331 (1) (577 SE2d 25) (2003) (evidence of asportation

---

[1] It was undisputed that Mendoza's subsequent movement from the chair to the floor was at her request; such volitional movement does not constitute asportation. See *Briard v. State*, 188 Ga. App. 490 (1) (373 SE2d 239) (1988).

sufficient where victim grabbed and forced six to eight feet into store in course of armed robbery). The definition of asportation has evolved to the point where it seems that the only type of movement considered insufficient as evidence of asportation is movement immediately resulting from a physical struggle. See, e.g., *Woodson*, supra, 273 Ga. at 558 (shoving and pulling victim to floor not sufficient); *Leppla v. State*, 277 Ga. App. 804 (1) (627 SE2d 794) (2006) (victim's struggling and falling to ground not sufficient).

In this Court's most recent pronouncement on the subject of asportation, we reaffirmed that "[t]he requirement of asportation to prove kidnapping is satisfied if there is movement of the victim, however slight that movement is. [Cit.] The distance that a kidnapper transports the victim is not of legal significance. [Cit.]" *Lyons v. State*, 282 Ga. 588, 591 (1) (652 SE2d 525) (2007). We went on to state, however, that

> where the movement involved is minimal, and the alleged kidnapping occurs in furtherance of some other criminal enterprise, in order to constitute "asportation" the movement must be more than a mere positional change of the victim incidental to the other criminal act; it must be movement, even if a positional change, designed to better carry out the criminal activity. [Cits.]

Id. at 591 (1). Thus, we held that asportation was established where the defendants had forced the victim at gunpoint from a standing to a supine position, because this positional change "materially facilitated" the defendants in suffocating and robbing the victim. Id. at 591-592 (1).

From our current vantage point, while the line drawn in *Lyons* — inconsequential movement versus movement "materially facilitating" another crime — may be analytically satisfying in harmonizing our courts' history of "hair-splitting decisions as to what is sufficient asportation," see *Haynes v. State*, 249 Ga. 119, 120 (1) (288 SE2d 185) (1982), this delineation does nothing to ameliorate the problems resulting from such a broad construction of the concept of asportation.

In its earliest incarnation, the common law crime of kidnapping required the asportation of the victim out of the country, the rationale being to prevent the victim's removal beyond law enforcement jurisdiction and isolation from the protection of the law. See 3 LaFave, Substantive Criminal Law, § 18.1 (a) (2d ed. 2003). Indeed, the earliest version of the Georgia kidnapping statute required removal of the victim across state or county lines. Ga. L. 1833, Nov.-Dec. Sess., pp. 143, 154, § 51. Over time, however, as legislative

attention turned increasingly to the subject in response to an increase in kidnappings correlating to more widespread use of the automobile as well as several high-profile abductions, the concept of asportation was broadened. See LaFave, supra, at § 18.1 (a); Model Penal Code and Commentaries, Pt. II, § 212.1, pp. 214-215 (Official Draft and Revised Comments 1980). Following this trend, the Georgia Legislature in 1953 rewrote the kidnapping statute, removing the territorial component from the asportation requirement and thus eliminating therefrom any explicit distance threshold. Ga. L. 1953, Nov.-Dec. Sess., p. 99, § 1

The removal of the territorial component and failure to substitute any other explicit distance threshold has resulted in "it [being] left to the courts to determine in more specific terms the bases upon which the asportation in the particular case should be judged." LaFave, supra, at § 18.1 (b), p. 9. And it is thus how our courts have come to expand the concept of kidnapping so drastically from its origins as to encompass movements as "slight" as stepping from one room of an apartment into another. As other courts and commentators have noted, and as this Court has witnessed, this expansive construction of asportation poses a potential danger that

> the definition of kidnapping will sweep within its scope conduct that is decidedly wrongful but that should be punished as some other crime. Thus, for example, the robber who forces his victim to move from one room to another in order to find a cashbox or open a safe technically may commit kidnapping as well as robbery. This reasoning raises the possibility of cumulative penalties or of higher sanctions for kidnapping, even though the "removal" of the victim to another place was part and parcel of the robbery and not an independent wrong.

(Footnote omitted.) Model Penal Code and Commentaries, supra, at § 212.1, pp. 220-221. In other words, the appending of a kidnapping charge bears the potential to subject a defendant to greatly enhanced punishment — ranging in Georgia from a minimum ten-year sentence to life imprisonment, see OCGA § 16-5-40 (b) — for conduct that would be treated less harshly but for the occurrence of victim movement in the course thereof. Because "[u]nder the present holdings, almost any crime in which a victim moves from the point of initial contact with the defendant would authorize a kidnapping charge," *Peterson v. State*, 212 Ga. App. 31, 33-34 (441 SE2d 267) (1994) (Blackburn, J., concurring specially), the expansive construction of asportation distorts the purpose of the kidnapping statute and raises serious constitutional issues.

First, by creating the potential for cumulative punishment under more than one criminal statute for a single course of conduct, such a construction implicates the principle of substantive double jeopardy, which "prevent[s] the sentencing court from prescribing greater punishment than the legislature intended." *Missouri v. Hunter*, 459 U. S. 359, 366 (III) (103 SC 673, 74 LE2d 535) (1983). See also *Drinkard v. Walker*, 281 Ga. 211, 212 (636 SE2d 530) (2006). Thus, using the armed robbery example cited above, is it reasonable to believe that the Legislature intended the mere fact of a victim's movement from one point to another within the situs of the robbery to justify another ten-years-to-life sentence in addition to the ten years to life prescribed for armed robbery?[2]

Second, convicting a person of kidnapping in a situation such as that in the armed robbery example or that presented herein poses a potential procedural due process problem. "[I]t is beyond question that the Due Process Clause requires that the law give a person of ordinary intelligence fair warning that [his] specific contemplated conduct is forbidden." *Hall v. State*, 268 Ga. 89, 92 (2) (485 SE2d 755) (1997). Though a person of ordinary intelligence would readily know that confining others against their will or committing armed robbery are acts which the law forbids, we are concerned that the plain language of the kidnapping statute may fail to provide fair warning that forcing the victims to move, however slightly, within the situs of the crime would justify prosecution for kidnapping.[3] The constitutional prohibition on vague laws is grounded not only in the principle of fair notice to the individual but also in the desirability of avoiding arbitrary and selective enforcement of criminal laws. See *Botts v. State*, 278 Ga. 538, 540 (604 SE2d 512) (2004). The relevance of the latter rationale in this context is clear: "[e]xperience reveals numerous instances of abusive prosecution under expansive kidnapping statutes for conduct that a rational and mature penal law would have treated as another crime." (Footnote omitted.) Model Penal Code and Commentaries, supra, at § 212.1, p. 221.

In addition to our constitutional concerns, we also note that, as is amply illustrated in the instant case, an expansive construction of asportation also effectively eviscerates the distinction between kidnapping and false imprisonment, the latter of which is treated by our statutory code as a serious crime but one that is far less serious than

---

[2] See OCGA § 16-8-41 (b) (penalties for armed robbery).

[3] The dissent's sequential recitation of Garza's actions actually underscores the notion of vagueness in this instance: though Garza's conduct was clearly reprehensible and deserving of punishment, to find that it constituted an "abduction" or "stealing away" – both terms which connote a literal taking from one place to another – requires a more strained construction of those terms than a person of ordinary intelligence would make.

the crime of kidnapping. See OCGA § 16-5-41 (b) (penalties for false imprisonment range from one to ten years imprisonment). Given that "[t]he only difference between the two offenses is asportation," *Ellis v. State*, 181 Ga. App. 630, 634 (5) (353 SE2d 822) (1987), an asportation requirement so easily satisfied fails to justify the dramatic distinction in penalties between the two offenses, and simply cannot represent what the Legislature intended in enacting the current kidnapping statute.

In recognition of these problems, "the great majority of jurisdictions have accepted the view that kidnapping should not be recognized as a separate offense whenever the asportation relied upon to establish the kidnapping is merely incidental to another offense." (Footnote omitted.) LaFave, supra, at § 18.1 (b), p. 11. See also 39 ALR5th 283, § 2 [a] (1996) ("The majority view is that kidnapping statutes do not apply to unlawful confinements or movements 'incidental' to the commission of other felonies."). Though we stated in *Lyons*, supra, 282 Ga. at 591 (1), that "a mere positional change . . . incidental to [an]other criminal act" is not sufficient to sustain a kidnapping conviction, the effect of the rule we adopted, which requires only that the movement be "designed to better carry out the criminal activity [cits.]" id., was in actuality to recognize as sufficient the use of movements that many other jurisdictions would view as "incidental" and thus not sufficient to sustain a kidnapping conviction. Compare *Lyons*, supra, 282 Ga. at 591 (1) (shift from standing to supine position sufficient); *Mercer v. State*, 289 Ga. App. 606 (1) (658 SE2d 173) (2008) (forcing of victim to floor and binding limbs during armed robbery sufficient), with *Kansas v. Kemp*, 46 P3d 31, 33-36 (Kan. Ct. App. 2002) (kidnapping convictions reversed where victim forced from one room to another and other victims forced from doorway to bedroom in course of aggravated robbery); *Walker v. Florida*, 604 S2d 475 (Fla. 1992) (kidnapping convictions vacated where defendant forced victims to back of store in course of armed robbery); *Tennessee v. Sanders*, 842 SW2d 257 (Tenn. Ct. App. 1992) (kidnapping conviction reversed where victim forced from parked car across street into restaurant and, along with other victims, forced into office and bound with duct tape in course of armed robbery); *Ohio v. Price*, 398 NE2d 772, 776 (V) (Ohio 1979) (kidnapping conviction reversed where "there was no act of asportation distinct from the rape either in time or in function"); *New York v. Ennis*, 377 NYS2d 600 (N.Y. App. Div. 1975) (kidnapping conviction modified to unlawful imprisonment where defendant forced victim from one room to another in course of attempted rape).

Accordingly, we find it necessary to adopt a more cogent standard for determining the sufficiency of evidence of asportation. Having surveyed the approaches of other jurisdictions in determin-

ing what movements are more than merely incidental to other criminal activity, we hereby adopt the test first articulated in *Govt. of Virgin Islands v. Berry*, 604 F2d 221 (3rd Cir. 1979), and since adopted by various of our sister states[4] as well as the Eleventh Circuit in its construction of the federal kidnapping statute. See *United States v. Howard*, 918 F2d 1529 (II) (B) (11th Cir. 1990).[5] The *Berry* test, formulated in an effort to synthesize the various standards adopted by those jurisdictions embracing the modern approach with respect to asportation, assesses four factors in determining whether the movement at issue constitutes asportation: (1) the duration of the movement; (2) whether the movement occurred during the commission of a separate offense; (3) whether such movement was an inherent part of that separate offense; and (4) whether the movement itself presented a significant danger to the victim independent of the danger posed by the separate offense. *Berry*, supra, 604 F2d at 227 (IV).[6] Assessment of these factors will assist Georgia prosecutors and courts alike in determining whether the movement in question is in the nature of the evil the kidnapping statute was originally intended to address — i.e., movement serving to substantially isolate the victim from protection or rescue — or merely a "criminologically insignificant circumstance" attendant to some other crime. Model Penal Code and Commentaries, Pt. II, supra at p. 221. To the extent prior case law and, specifically, the "slight movement" standard are inconsistent with this approach, those cases and that standard are hereby overruled.

The dissent characterizes our effort to recalibrate the construction of our kidnapping statute as a "judicial usurpation of the legislative function." Though we acknowledge the Legislature's implicit acquiescence in the "slight movement" standard, we believe this case to be one of those rare occasions in which our interpretative error has become so manifest, and its consequences so potentially

---

[4] See, e.g., *Connecticut v. Salamon*, 949 A2d 1092 (I) (Conn. 2008); *Hoyt v. Virginia*, 605 SE2d 755 (II) (Va. Ct. App. 2004); *New Jersey v. La France*, 569 A2d 1308 (I) (N.J. 1990); *Illinois v. Smith*, 414 NE2d 1117, 1122 (Ill. Ct. App. 1980). See also *Hurd v. Alaska*, 22 P3d 12, 19, n. 27 (Alaska Ct. App. 2001) (citing *Berry* factors favorably); *Tennessee v. Cozart*, 54 SW3d 242, 245 (Tenn. 2001) (citing *Berry* favorably); *Colorado v. Bell*, 809 P2d 1026 (V) (Colo. Ct. App. 1990) (citing *Berry* in reversing kidnapping conviction).

[5] Though the dissent discounts the *Berry* test as not having been widely adopted by other federal circuits, we embrace the *Berry* test, as have other state courts, see note 4, supra, not because it is universally or even predominantly accepted as the definitive test for asportation but rather because we find that it provides meaningful guidance for determining the existence of asportation that not only helps restore that concept to its original meaning but also does not conflict in any way with the plain language of our kidnapping statute.

[6] Similar factors have been cited as relevant by other courts both before and after the *Berry* decision. See, e.g., *Maryland v. Stouffer*, 721 A2d 207, 215 (Md. Ct. App. 1998); *Faison v. Florida*, 426 S2d 963, 965-966 (Fla. 1983); *Kansas v. Buggs*, 547 P2d 720, 730-731 (Kan. 1976).

serious, that reliance on legislative silence as the justification for perpetuating this error would be gravely misplaced. As we have noted:

> "Minor errors, even if quite obvious, or important errors if their existence be fairly doubtful, may be adhered to and repeated indefinitely; but the only treatment for a great and glaring error affecting the current administration of justice . . . is to correct it. When an error of this magnitude and which moves in so wide an orbit competes with truth in the struggle for existence, the maxim for a supreme court, supreme in the majesty of duty as well as in the majesty of power, is not stare decisis, but fiat justitia ruat coelum [let justice be done, though the heavens should fall]."

(Citation omitted.) *Humthlett v. Reeves*, 211 Ga. 210, 216 (1) (85 SE2d 25) (1954). Accord *Etkind v. Suarez*, 271 Ga. 352, 360 (519 SE2d 210) (1999) (Benham, C. J., dissenting) (" 'The rule of stare decisis is a wholesome one, but should not be used to sanctify and perpetuate error. . . . Courts, like individuals, but with more caution and deliberation, must sometimes reconsider what has been already carefully considered, and rectify their own mistakes' [Cit.]"). Certainly, correcting past error in the construction of a statute even in the face of legislative inaction is not unprecedented. See, e.g., *Ketchup v. Howard*, 247 Ga. App. 54 (1), (2) (543 SE2d 371) (2000) (overruling 25-year-old precedent construing Georgia Medical Consent Law despite Legislature's implicit acquiescence). In *Ketchup*, the time-honored principle of stare decisis and the correlative principle of legislative acquiescence were set aside where the courts' past construction of the statute "went beyond the legislative intent" of the statute, id. at 57; potentially implicated constitutional rights; and ran contrary to the approach of a majority of other states. Id. at 54 (1). In this case, those same circumstances are present and equally justify a break from precedent. Indeed, though "[s]tability and certainty in law are desirable . . . [, w]hen a majority of this court determines that stability must give way to justice . . . , then justice prevails." (Citation omitted.) *Hall v. Hopper*, 234 Ga. 625, 631-632 (3) (216 SE2d 839) (1975).

2. Applying the *Berry* factors to the evidence in this case, it is clear that neither of the two distinct movements of Mendoza during Garza's false imprisonment of her constitute the necessary asportation to support a kidnapping conviction. Both the act of falling to the floor and the act of rising to sit in the chair where Mendoza was bound were of minimal duration and occurred during the course of and incidental to Garza's false imprisonment of Mendoza and her

children. Additionally, the blow that caused Mendoza's fall was an inherent part of the aggravated assault of which Garza was convicted. Moreover, Mendoza's movements did not significantly increase the dangers to her over those she faced as a victim of false imprisonment or aggravated assault. Application of the *Berry* factors thus clearly supports the reversal of Garza's conviction of the kidnapping of Mendoza.

3. The kidnapping charge as to J. M., while involving a slightly greater quantum of movement than that as to Mendoza, nonetheless meets a similar fate under the *Berry* test. The record reflects that, when police attempted to enter the apartment, Garza jumped onto the couch where J. M. had been sleeping, asked if he wanted to play cops and robbers, and grabbed J. M.'s shirt, forcing him into an adjoining bedroom where the two stayed for the next approximately two to three hours while police attempted to negotiate J. M.'s release from outside via cell phone. On one or more occasions when Garza's cell phone battery ran out, Garza forced J. M. to walk with him down the hallway to retrieve replacement cell phones thrown into the front room by police. As with Mendoza, the movements themselves were of short duration and occurred as minor incidents in the course of Garza's false imprisonment of J. M. There was no evidence that the movements served to conceal J. M. from police, who were already aware he was being detained, to thwart in any appreciable way the efforts of police to free J. M., or to enhance significantly the risk J. M. already faced as the victim of false imprisonment. Accordingly, Garza's conviction for the kidnapping of J. M. must also be reversed.[7]

By adopting the above mode of analysis, we join in the "modern approach" and construe OCGA § 16-5-40 (a) so as " 'to prevent gross distortion of lesser crimes into a much more serious crime.' [Cit.]" *Berry*, supra, 604 F2d at 226-227 (IV). In accordance with such mode of analysis, we hereby reverse the judgment below as to Counts 1 and 2. In all other respects, including Garza's convictions on four counts of false imprisonment and one count of aggravated assault, the judgment below is affirmed.

---

[7] Though we recognize that Garza has not explicitly challenged the sufficiency of the evidence of asportation as to J. M., because we granted certiorari on the question of the sufficiency of the evidence of asportation generally, our adoption of a new legal standard for asportation compels a fresh assessment of the sufficiency of the evidence thereof as to J. M. Because due process requires the existence of sufficient evidence as to every element of the crime of which a defendant is convicted, *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979), the fact that this issue was not explicitly raised does not prevent us from addressing (nor, more importantly, does it justify a refusal to address) the issue at this juncture. See, e.g., *Victorine v. State*, 264 Ga. 580 (1) (449 SE2d 91) (1994) (reviewing sufficiency of evidence even where general grounds not raised); *Kelley v. State*, 279 Ga. App. 187 (1) (630 SE2d 783) (2006) (same).

*Judgment affirmed in part and reversed in part. All the Justices concur, except Carley, Hines, and Melton, JJ., who dissent.*

CARLEY, Justice, dissenting.

I respectfully dissent from all three divisions of the majority opinion. In Division 1, the majority usurps the function of the legislature by abruptly and unnecessarily reinterpreting our kidnapping statute. Based on this improper reinterpretation of well settled law, the majority erroneously concludes in Division 2 that there is insufficient evidence of asportation to support Garza's conviction for kidnapping Ms. Mendoza. In Division 3, the majority abandons its judicial role to take on the role of an advocate by ruling on an issue not raised by the Appellant, and also erroneously concludes that there is insufficient evidence of asportation to support Garza's conviction for kidnapping nine-year-old J. M.

1. Over half a century ago, the Georgia General Assembly amended the kidnapping statute, removing any precise distance requirement from the asportation element of the crime. Ga. L. 1953, Nov.-Dec. Sess., pp. 99-100, § 1. In 1968, the legislature again amended the statute, removing "force" as an element of kidnapping. Ga. L. 1968, pp. 1249, 1282; Molnar, Ga. Criminal Law (6th ed.), Kidnapping and Related Offenses, p. 766, § 42-1. That 1968 version of the statute is, in all material respects, identical to the current codification of the statute in defining the crime of kidnapping as being committed when a person "abducts or steals away any person without lawful authority or warrant and holds such person against his will." Ga. L. 1968, pp. 1249, 1282, § 26-1311 (a); OCGA § 16-5-40 (a). Since then, the appellate courts of this state have repeatedly held that the kidnapping statute's element of asportation is satisfied by any movement of the victim, however slight, and that there is no minimum requirement as to distance. *Lyons v. State*, 282 Ga. 588, 591 (1) (652 SE2d 525) (2007); *Griffin v. State*, 282 Ga. 215, 219 (1) (b) (647 SE2d 36) (2007); *Lenon v. State*, 290 Ga. App. 626, 628 (1) (660 SE2d 16) (2008); *Chemielowiec v. State*, 250 Ga. App. 66 (1) (550 SE2d 120) (2001); *Estes v. State*, 234 Ga. App. 150, 151 (505 SE2d 840) (1998); *Chambley v. State*, 163 Ga. App. 502, 503-504 (1) (295 SE2d 166) (1982); *Brown v. State*, 132 Ga. App. 399, 401-402 (2) (208 SE2d 183) (1974).

During the more than three decades that the Georgia courts have interpreted the kidnapping statute as requiring only slight movement, the General Assembly has amended the statute several times, but never in order to change this clearly accepted meaning of asportation. Ga. L. 1982, pp. 970-971, § 1; Ga. L. 1994, pp. 1959, 1962-1963, § 4; Ga. L. 2006, pp. 379, 385, § 5. Indeed, the General Assembly has even rejected a suggestion from this Court that it enact

such an amendment. Over a quarter century ago, this Court, in an opinion affirming a kidnapping conviction where the victim was forced to walk 25 feet at gunpoint, expressed its belief that the General Assembly should enact specific legislation amending the Georgia Code "to eliminate the hair-splitting decisions as to what is sufficient asportation . . . ." *Haynes v. State*, 249 Ga. 119, 120 (1) (288 SE2d 185) (1982). However, the General Assembly clearly disagreed with that suggestion, as evidenced by its continuing refusal to enact any such amendment to the kidnapping statute. Nevertheless, the majority now disregards the General Assembly's implicit legislative approval of the well established interpretation of the kidnapping statute and takes it upon itself to do what the General Assembly has chosen not to do, by changing the accepted meaning of the statute.

> "Where a statute has, by a long series of decisions, received a judicial construction in which the General Assembly has acquiesced and thereby given its implicit legislative approval, the courts should not disturb that settled construction. (Cits.) '(E)ven those who regard "stare decisis" with something less than enthusiasm recognize that the principle has even greater weight where the precedent relates to interpretation of a statute.' (Cit.) A reinterpretation of a statute after the General Assembly's implicit acceptance of the original interpretation would constitute a judicial usurpation of the legislative function." [Cit.]

*RadioShack Corp. v. Cascade Crossing II*, 282 Ga. 841, 843 (653 SE2d 680) (2007).

This principle is particularly true where, as here, the General Assembly has amended the statute, but none of the amendments have altered an existing judicial interpretation of the statute. *Tiisman v. Linda Martin Homes Corp.*, 281 Ga. 137, 139 (1) (637 SE2d 14) (2006). Moreover, as recently recognized by the Supreme Court of a sister jurisdiction, even a prior statutory interpretation that is incorrect should still be applied if the legislature amends the statute without changing that interpretation.

> We . . . hold that — in cases where this Court concludes a statute was incorrectly interpreted in a previous case — we will nevertheless continue to apply the previous interpretation, pursuant to the doctrine of stare decisis, upon finding the Legislature amended or reenacted the statute without correcting the prior interpretation. In our view, such action on the part of the Legislature amounts to incorporation of

our previous interpretation into the reenacted or amended statute. The Legislature is, of course, free to preclude our incorrect interpretation by specific provision, failing which, we must conclude that the legislative silence amounts to acquiescence. Stated another way, the incorrect interpretation becomes a correct interpretation because of the Legislature's tacit adoption of the prior interpretation into the amended or reenacted statute.

*Caves v. Yarbrough*, 991 S2d 142, 153-154 (II) (Miss. 2008).

In the instant case, the majority's reinterpretation of OCGA § 16-5-40 (a), accomplished through its refusal to adhere to the General Assembly's tacit adoption of the long line of cases holding that slight movement is sufficient and its imposition of a new four-part test for asportation, constitutes a judicial usurpation of the legislative function. If the kidnapping statute is to be so revised to include a new four-part test, the General Assembly, rather than this Court, must take that action. See *Etkind v. Suarez*, 271 Ga. 352, 358 (5) (519 SE2d 210) (1999) (consistent interpretation of statute is binding law and will be followed unless statute has been changed by legislative action).

Not only does the majority improperly take on the legislative function, but its reasons for doing so are unfounded. The majority first claims that the well settled construction of the kidnapping statute "implicates the principle of substantive double jeopardy, which 'prevent(s) the sentencing court from prescribing greater punishment than the legislature intended.' [Cits.]" (Maj. Op. p. 700.) However, there is nothing in the accepted interpretation of the kidnapping statute that would allow a sentencing court to prescribe a greater punishment than the legislature intended. On the contrary, given the legislature's decades-long acquiescence in that interpretation, along with the clear legislative rejection of this Court's prior suggestion that the Code be amended, the only logical conclusion is that the longstanding construction of the kidnapping statute accomplishes precisely what the legislature intended. The statute plainly sets forth punishments for kidnapping and, of course, such punishments cannot be imposed by a court until all the elements of kidnapping, including asportation, have been proved beyond a reasonable doubt. OCGA § 16-5-40 (b) & (c). Nothing in the well settled interpretation of the statute contravenes that legislative intent.

The majority next raises a vagueness challenge, stating that it is "concerned that the plain language of the kidnapping statute may fail to provide fair warning that forcing the victims to move, however slightly, within the situs of the crime would justify prosecution for kidnapping." (Maj. Op. p. 700.) However, " '[t]o withstand a vague-

ness challenge, "all that is required is that the language 'convey sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices.' " (Cit.)' " *Randolph v. State*, 269 Ga. 147, 150 (2) (496 SE2d 258) (1998). Because the majority's vagueness concern here does not involve First Amendment freedoms, we must limit our decision to application of the statute to Appellant Garza's conduct in this case. *Thelen v. State*, 272 Ga. 81 (526 SE2d 60) (2000).

Garza's conduct included tricking Ms. Mendoza into letting him into her home, locking the door, drawing a gun, placing it against her head, threatening to shoot her, hitting her head with the gun and thereby causing her to fall to the floor and her head to bleed, binding the prone victim's wrists with electrician's tape that he had brought with him, tying her ankles with a torn sheet, forcing her up, moving her to a chair, gagging her with a baby diaper, and ordering her not to move from the chair. Garza then removed the bulbs from all the lights in the house, removed the knives from the kitchen and disabled the telephone. Throughout the ordeal, he continued to threaten Ms. Mendoza with the gun, threatened to shock her with an electrical cord, made threats about shooting her three young children who were also in the residence, and repeatedly placed the gun against her baby's head. After the victim had been held in the chair for approximately two hours, Garza allowed her to move to a couch, where he placed a noose tied to a baseball bat around her neck. At four o'clock in the morning, nearly six hours after Garza had first entered the home, Ms. Mendoza was able to escape through a window with one of her children when Garza fell asleep.

The police subsequently came to the scene and were able to remove one of the children from the house. Garza, however, continued to hold J. M. hostage for several more hours. During that time, while still holding his gun, Garza grabbed J. M.'s shirt and forced the boy to move from one room to another. He also forced J. M. to walk down a hallway and back to a bedroom on more than one occasion.

"To satisfy due process considerations, criminal [statutes] must place a person of ordinary intelligence on notice that his contemplated conduct is illegal. [Cit.]" *Alexander v. State*, 279 Ga. 683, 686 (3) (620 SE2d 792) (2005). Because a person of ordinary intelligence would surely know that Garza's conduct was an illegal abduction and holding of the victims against their wills, the statute satisfies due process considerations.

Next, the majority notes that " 'the great majority of jurisdictions have accepted the view that kidnapping should not be recognized as a separate offense whenever the asportation relied upon to establish the kidnapping is merely incidental to another offense.'

[Cit.]'' (Maj. Op. p. 701.) Claiming that Georgia law is not consistent with that of many other jurisdictions, the majority goes on to say that "[a]ccordingly, we find it necessary to adopt a more cogent standard for determining the sufficiency of evidence of asportation[,]" and the way to do so is by adopting the four-part test "articulated in *Govt. of Virgin Islands v. Berry*, 604 F2d 221 (3rd Cir. 1979)." (Maj. Op. pp. 701-702.) According to the majority, by adopting this test it "join[s] in the 'modern approach.' " (Maj. Op. p. 704.)

Contrary to the majority's rationale, the *Berry* test cannot fairly be characterized as "the modern approach" since it has only been used in a handful of jurisdictions. Indeed, a federal circuit court recently noted that " '(t)he Berry test has not been widely adopted by other Circuits . . . .' [Cit.]" *United States v. Zuni*, 273 Fed. Appx. 733, 742 (I), fn. 5 (10th Cir. 2008). Moreover, as noted above, the majority opinion recognizes that "the great majority of jurisdictions" accepts the view that movement which is merely incidental to another crime is not sufficient asportation. Prior to today's decision, Georgia already was part of this "great majority." As previously pronounced by this Court,

> where the movement involved is minimal, and the alleged kidnapping occurs in furtherance of some other criminal enterprise, in order to constitute "asportation" the movement must be more than a mere positional change of the victim incidental to the other criminal act; it must be movement, even if a positional change, designed to better carry out the criminal activity. [Cits.]

*Lyons v. State*, supra. Because Georgia already is part of the "great majority" of jurisdictions which hold that minimal movement merely incidental to another crime is not sufficient asportation, the majority's belief that it needs to legislate a new four-part test in order to join what it characterizes as "the modern approach" is groundless.

Finally, the majority attempts to justify its disregard for well settled law by relying on *Ketchup v. Howard*, 247 Ga. App. 54 (543 SE2d 371) (2000). Of course, an opinion from the Court of Appeals is not binding on this Court. See Ga. Const. of 1983, Art. VI, Sec. V, Par. III. Moreover, *Ketchup* is materially distinguishable from the instant case.

*Ketchup* overruled *Young v. Yarn*, 136 Ga. App. 737 (222 SE2d 113) (1975), which interpreted part of the Georgia Medical Consent Law in such a way that it implicitly rejected the common law doctrine of informed consent. *Ketchup v. Howard*, supra at 54. The Court of Appeals' decision to overrule *Young v. Yarn* was based, in large part, on three critical factors that are not present in the instant

case. First, the Court of Appeals noted that all of the states except Georgia already recognized the informed consent doctrine. *Ketchup v. Howard*, supra. Second, the Court of Appeals noted that "the Supreme Court of Georgia has never held that the principle announced in *Young v. Yarn* was correct." *Ketchup v. Howard*, supra at 64 (5). Finally, and perhaps most critically, the Court of Appeals noted that "[s]ubsequent to the *Young v. Yarn* decision, the legislature enacted OCGA § 31-9-6.1, which requires medical professionals to provide information to their patients concerning the risks of some . . . medical procedures." *Ketchup v. Howard*, supra at 61 (3).

In the instant case, unlike *Ketchup*, Georgia does not stand alone in its kidnapping law, but is already part of the great majority of jurisdictions. This Court has repeatedly approved and applied the well established meaning of asportation in our kidnapping statute, and the General Assembly has not enacted any legislation to change that accepted meaning, even ignoring a specific request from this Court that it do so. If anything, these critical differences between the instant case and *Ketchup* demonstrate precisely why the majority's opinion in this case is an improper and unnecessary intrusion into the legislative arena.

2. The majority reverses Garza's conviction for kidnapping Ms. Mendoza by applying its new four-part test. Because that test is not the rule in Georgia, it should not be applied in this case and reversal of the conviction on that basis is not authorized. Rather, the longstanding Georgia law on asportation, as accepted by the legislature, applies to this case. See *Lyons v. State*, supra. Under that law, it is clear that the asportation element of kidnapping is satisfied by Garza's knocking the victim to the ground with a gun and then forcing her up and moving her to a chair. See *Lenon v. State*, supra; *Norman v. State*, 269 Ga. App. 219, 221 (1) (603 SE2d 737) (2004) (ordering victim to move at gunpoint sufficient asportation).

Although the distance of that movement may have been minimal, it was not merely incidental to some other criminal act, but was in fact designed to carry out better Garza's criminal activity. See *Lyons v. State*, supra; *Leppla v. State*, 277 Ga. App. 804, 807 (1) (627 SE2d 794) (2006). Construed most strongly to support the verdict, the evidence shows that Garza's criminal plan was to hold Ms. Mendoza and her children hostage until her cousin, whom Garza had previously dated, arrived at the home with her new boyfriend so he could kill the two of them. Accordingly, it is clear that the movement of Ms. Mendoza was not merely incidental to Garza's assault on her, but instead materially facilitated the subsequent holding of the family hostage to further Garza's plan to kill his former girlfriend and her boyfriend. Consequently, there is sufficient evidence of

asportation and Garza's conviction should be affirmed. See *Lyons v. State*, supra at 592 (1).

3. In Division 3, the majority sua sponte reverses the judgment of conviction as to the kidnapping of J. M. In a footnote, the majority acknowledges "that Garza has not explicitly challenged the sufficiency of the evidence of asportation as to J. M. . . ." (Maj. Op. p. 704, fn. 7.) That acknowledgment, while correct, is misleading in that it implies that Garza may have somehow implicitly challenged the sufficiency of the evidence. However, the undisputed fact is that Garza has not raised any challenge to his conviction for kidnapping J. M., either in his filings in this Court or in the Court of Appeals. "It is not the function of this Court to advocate or advance positions not advanced by the parties." *Turner v. Flournoy*, 277 Ga. 683, 686 (2) (594 SE2d 359) (2004). Here, the majority has improperly become an advocate for Garza by advancing a position on his behalf.

Moreover, even if Garza had challenged the sufficiency of the evidence of asportation as to J. M., such a challenge is wholly without merit. As the majority recounts, the evidence shows that Garza jumped onto the couch where J. M. had been sleeping, grabbed J. M.'s shirt, forced him into an adjoining bedroom where the two stayed for the next two to three hours while police attempted to negotiate J. M.'s release, and forced J. M. to walk with him down a hallway on more than one occasion. (Maj. Op. p. 704.) Under the well settled law of this state, such evidence was more than sufficient to establish asportation and to support Garza's kidnapping conviction. See *Lyons v. State*, supra; *Haynes v. State*, supra. Accordingly, I must dissent from the majority's improper reversal of a conviction not challenged by Garza.

I am authorized to state that Justice Hines and Justice Melton join in this dissent.

DECIDED NOVEMBER 3, 2008 —
RECONSIDERATION DENIED DECEMBER 15, 2008.

*L. David Wolfe, Robert A. Susor*, for appellant.
*Cecilia M. Cooper, District Attorney, Daniel P. Bibler, Assistant District Attorney*, for appellee.