**SECOND DIVISION**
**BARNES, P. J.,**
**ADAMS and MCFADDEN, JJ.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed. (Court of Appeals Rule 4 (b) and Rule 37 (b), February 21, 2008) http://www.gaappeals.us/rules/

**May 10, 2012**

# In the Court of Appeals of Georgia

A12A0059. DAY v. THE STATE.

BARNES, Presiding Judge.

Brian Dale Day was convicted of two counts of aggravated assault, kidnapping, aggravated sodomy, three counts of burglary, stalking, aggravated stalking, two counts of possession of a knife during the commission of a crime, possession of a firearm during the commission of a crime, and the possession of a firearm by a felon. He appeals, contending that the trial court erred in admitting similar transaction evidence; that the evidence of kidnapping was insufficient; and that his sentence of one of the firearms charges exceeds the statutory limit. For the reasons that follow, we affirm.

We review the evidence in the light most favorable to the jury's verdict. *Lytle v. State*, 290 Ga. 177 (1) (718 SE2d 296) (2011). So viewed, the evidence showed

that Day, the victim, and the victim's children were living together, but the victim moved out of Day's house on August 6, 2006, after she awoke on the sofa three times to find him standing over her and masturbating while watching a pornographic video on his bedroom television. The victim got up and went into her daughter's bedroom, where she blocked the door with furniture, and she and her children moved out the next morning. While the victim was working that night, she took the trash out to the isolated trash bin behind the store early, and when she went outside to smoke a cigarette at her usual garbage disposal time of 3 a.m., she saw Day lurking behind the building, so she ran inside and called her parents.

The next morning, the victim spoke to Day, who denied being at the store and said he was on his way to work. The victim and her mother went to Day's house a few hours later to retrieve her belongings, thinking he would be at work. His truck was not there, but after five minutes he came out of a back bathroom and announced his presence. The victim was frightened of him and left with her mother after telling Day he had better not been masturbating in her daughter's presence. She later retrieved her things with help from co-workers.

Day continued to call the victim's cell phone but she did not answer. On September 5, 2006, the victim was asleep at her mother's house when she awoke to

2

find Day "standing over" her with "his penis in one hand and knife in the other hand," masturbating. The victim sat up and talked Day into going to the kitchen with her for coffee. Day dropped the knife to pull up his pants, and the victim called 911 when he wasn't looking. She asked him to leave but he would not do so. When a deputy sheriff drove up, Day ran away, and the deputy retrieved the knife, which had an eight-inch blade, from the bedroom floor by the bed. While en route to the scene, a sergeant saw what he later identified as Day's truck parked a quarter of a mile from the victim's house.

Day was arrested the next day, September 6, 2006, and released on bond the day after that. The victim immediately obtained a temporary family violence protective order against him, and then after Day was served with the petition and the court held a hearing at which he did not appear, the victim obtained a one-year family violence protective order against him. Day was indicted on October 3, 2006, for aggravated assault, burglary, two counts of possession of a knife during the commission of a crime, peeping tom, and stalking. The victim subsequently reported on October 24, 2006 that someone had broken into her house, pulled her window air conditioning unit out and put it in backwards, but the investigating deputies were unable to obtain usable fingerprints.

3

Finally, in the morning of November 8, 2006, after her children left for school and her parents were at work, the victim walked out and locked her back door, intending to go to her job site until she attended a later appointment because she "didn't feel comfortable" being there alone. She began to walk down the steps to her car when she saw Day squatting down by the stairs, holding a handgun. She began crying and Day forced her into the house as she begged him not to hurt her. With the gun pointed at her, Day forced her to disrobe, placed a vibrator inside her, and put his penis in her mouth until he ejaculated in her mouth and hair. Some of his semen also spilled onto the bathroom rug, and he grabbed the rug and directed the victim to drive him to his truck. As they drove to a nearby dirt road, Day held the gun on the victim and threatened to kill her if she went to the police. He got out of her car with the rug and the vibrator, and the victim drove to the sheriff's office to report the crimes.

A nurse swabbed the victim's mouth and cut a swatch of her hair to send to the GBI laboratory for testing. A forensic biologist testified that the DNA profile obtained from the victim's hair matched Day's profile. Investigators found the victim's rug in the woods and tire tracks off the dirt road about half a mile from the victim's house.

The State introduced evidence of two similar transactions, both from ex-wives of Day. One ex-wife, who had married Day when she was 16 and divorced him about four years later in 1993, testified that Day forced her to have sex with him while they were married. In 1992, after they separated, she stopped to help him when she saw him standing by his apparently broken-down truck on a road she traveled regularly. He pulled a knife on her, dragged her into the woods, and raped her. An investigator with the sheriff's department recovered a knife in the location the ex-wife showed him. Day was arrested and gave a statement admitting he "was in the wrong" and asking his then-wife to forgive him. She later dropped the charges because, she explained, she had loved him and thought he would change, but left for good after he pulled a knife on her again. After she left, Day broke into the apartment she shared with her sister and raped her at knife point. She obtained a protective order but in 1993 Day subsequently accosted her with a knife in her driveway, an attack which resulted in convictions for aggravated assault and aggravated stalking.

A second ex-wife testified that before they were married in 2000, Day put a knife to her throat and forced her to have sexual intercourse, but she did not report it because Day was seeing a counselor and she "thought it was something that could be fixed." During her two-year marriage to Day, he repeatedly forced her to perform

5

oral sex and have intercourse with him, after which he would cry and apologize. After she made him move out, he returned and forced himself on her while her six-year-old son was "right outside" the door. She reported the assault to police, but did not prosecute it because she "didn't want to have to be be judged and looked down on."

1. Day contends that the trial court erred in admitting the similar transaction evidence from his two ex-wives, which he argues was not offered for a proper purpose and was more prejudicial than probative. Day argues that the probative value of his ex-wives' testimony about his sexual assaults using a knife was "marginal" and outweighed by its prejudicial impact because the *victims'* credibility was questionable. Day also argues that the probative value of his first ex-wife's testimony was limited because the transactions occurred more than a decade earlier, because she never "pressed charges," and because he was never tried or convicted of any offenses against her. The trial court determined that the similar transaction evidence was admissible and probative of Day's course of conduct and method of operation, intent, motive, bent of mind, lustful disposition, and lack of consent.

Before evidence of a similar transaction is admissible in a criminal trial, the State must show: (1) that it seeks to introduce the similar transaction for an appropriate purpose, (2) that sufficient evidence establishes that the accused

6

committed the similar transaction, and (3) that a sufficient connection or similarity exists between the transaction and the crime charged, "so that proof of the former tends to prove the latter." *Williams v. State*, 261 Ga. 640, 642 (2) (b) (409 SE2d 649) (1991). "[T]he evidence is not to be admitted if it is done so merely to raise an improper inference about the character of the accused." *Humphrey v. State*, 281 Ga. 596, 598 (2) (642 SE2d 23) (2007).

Evidence of prior bad acts involving sexual offenses is admissible "to show defendant's bent of mind toward the sexual activity with which he was charged or defendant's lustful disposition." (Emphasis omitted.) *Helton v. State*, 206 Ga. App. 215, 216 (424 SE2d 806) (1992). Further, "[i]n cases of domestic violence, prior incidents of abuse against family members or sexual partners are more generally permitted because there is a logical connection between violent acts against two different persons with whom the accused had a similar emotional or intimate attachment." (Footnote omitted.) *Thomas v. State*, 246 Ga. App. 448, 449 (1) (540 SE2d 662) (2000). Finally, "[e]vidence of an earlier assault on a woman is material to the issue of consent or the lack thereof, and has a direct bearing on appellant's bent of mind." (Citation omitted.) *Goodroe v. State*, 238 Ga. App. 66, 68 (2) (b) (518 SE2d 139) (1999).

In this case, both of Day's ex-wives and the victim he had been living with testified that Day repeatedly held a knife on them to force them to perform sexual activities. The similarities between the prior bad acts and the acts for which Day was on trial were relevant to the issue of consent, *Goodroe*, 238 Ga. App. at 69 (2) (b), and were not too remote in time to be admissible. "Given that the similar transaction evidence reflects appellant's behavior towards prior spouses, we conclude that any prejudice from the age of these prior incidents was outweighed by the probative value of the evidence under the particular facts of this case and the purpose for which the similar transactions were offered." *Hall v. State*, 287 Ga. 755, 757 (2) (699 SE2d 321) (2010).

2. Day contends that there was insufficient evidence of the asportation element of kidnapping under *Garza v. State*, 284 Ga. 696 (670 SE2d 73) (2008),[1] arguing that the movement of the victim from her house to her car was of minimal duration and merely incidental to one of the aggravated assault charges.

*Garza* sets out four factors to consider when determining whether the evidence met the asportation element of kidnapping:

---

[1]As Day's acts occurred before the July 1, 2009 effective date of OCGA § 16-5-40 (b), the asportation test set forth in *Garza* applies to this case. *Hammond v. State*, 289 Ga. 142, 143, n. 2, 144 (1) (710 SE2d 124) (2011).

(1) the duration of the movement; (2) whether the movement occurred during the commission of a separate offense; (3) whether such movement was an inherent part of that separate offense; and (4) whether the movement itself presented a significant danger to the victim independent of the danger posed by the separate offense.

*Garza*, 284 Ga. at 702 (1). In this case, the duration of the victim's movement while Day forced her to drive him to his truck was not brief or momentary and was not an inherent part of the aggravated assault. The movement also presented a significant increased danger to the victim apart from the aggravated assault and other offenses because it enhanced Day's control over her and isolated her from possible rescue. See *Jones v. State*, ___ Ga. ___ (1) (Case No. S12A0040, decided March 5, 2012). Accordingly, we find no merit in this enumeration.

3. Day asserts that the trial court erred in sentencing him to ten years on Count 8, for the offense of possession of a firearm during the commission of a crime, which exceeds the statutory maximum sentence of five years. OCGA § 16-11-106 (b) (1). The trial court did not sentence Day to ten years for this offense, however; it sentenced him to five years for this offense, and five years for the separate offense of possession of a firearm by a convicted felon under OCGA § 16-11-131 (b). Thus, the trial court did not err in sentencing Day.

*Judgment affirmed. Adams and McFadden, JJ., concur.*