**THIRD DIVISION**
**MILLER, P. J.,**
**RAY and BRANCH, JJ.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed. (Court of Appeals Rule 4 (b) and Rule 37 (b), February 21, 2008) http://www.gaappeals.us/rules/

**March 19, 2013**

# In the Court of Appeals of Georgia

A12A1676. TUDOR v. THE STATE.

BRANCH, Judge.

James Melvin Tudor was tried by a Whitfield County jury and convicted of two counts of aggravated sexual battery,[1] four counts of child molestation,[2] and one count of enticing a child for indecent purposes.[3] He now appeals from the denial of his motion for a new trial, asserting that the evidence was insufficient to sustain his convictions. Finding that the evidence supports the jury's verdict, we affirm.

---

[1] OCGA § 16-6-22.2 (b). For sentencing purposes, the trial court merged one of these counts with one of the counts of child molestation.

[2] OCGA § 16-6-4 (a).

[3] OCGA § 16-6-5 (a).

On appeal from a criminal conviction, the defendant is no longer entitled to a presumption of innocence and we therefore construe the evidence in the light most favorable to the jury's guilty verdict. *Martinez v. State*, 306 Ga. App. 512, 514 (702 SE2d 747) (2010). So viewed, the record shows that this case involved three victims: B. C., her younger sister H. C., and R. H. At the time of the incidents in question, B. C. was seven years old and H. C. and R. H. were each four years old. Tudor's wife, Donnelle, babysat all of the victims in the couple's home. On April 7, 2009, Donnelle left B. C. and H. C. in the care of her husband while she went to pick up her grandchildren from school. That evening, B. C. reported to her mother that when Donnelle left the home, she and H. C. were sitting on the sofa in the living room watching cartoons. After Donnelle departed, Tudor called her into the kitchen area of the home, told B. C. to lean across the kitchen table, and stuck his hand down her pants. B. C. also told her mother that H. C. was present when Tudor molested her. When questioned by her mother, H. C. confirmed that she saw B. C. bent over the kitchen table and Tudor sticking his hand down her pants.

The mother reported this incident to the Whitfield County Sheriff's Department, which arranged for her to take B. C. to a local hospital. Once at the hospital, B. C. was interviewed by both the detective assigned to investigate her claims as well as the

nurse who examined her for signs of possible sexual molestation. B. C. gave substantially similar accounts to both the detective and the nurse of what Tudor had done. Specifically, B. C. told both of them that after Donnelle left the house that day, Tudor called B. C. into the kitchen and told her to lie across the kitchen table. He then placed his hands inside B. C.'s pants, beneath her underwear, and fondled her vaginal area and digitally penetrated her anus. Despite B. C.'s protests, Tudor did not stop until Donnelle returned to the residence. Tudor gave B. C. a piece of candy, and told her several times not to tell anyone what had happened, warning her that if she did, she would not get any more candy.

B. C. also told the detective that her younger sister, H. C., was present in the kitchen when Tudor molested her. Additionally, B. C. repeated her account of what had occurred during an interview conducted by a certified forensic interviewer. This interview was recorded and that recording was introduced into evidence at trial and played for the jury. The forensic interviewer also conducted an interview of H. C., and a recording of that interview was introduced into evidence and played for the jury. During that interview, H. C. confirmed that she had been present in the kitchen when Tudor molested her sister, and that afterwards Tudor had given them candy.

3

The nurse who examined B. C. at the hospital is certified as an advanced sexual assault nurse examiner, and she was qualified as an expert at trial. During the physical exam of B. C., the nurse observed symptoms in B. C.'s genital and anal areas that were consistent with someone fingering, rubbing, or digitally penetrating those areas. The nurse made clear that she could not state definitively whether digital penetration, other trauma, or fondling had occurred; she could only say that the physical symptoms she observed were consistent with that type of trauma.

As a result of the interviews and the physical exam of B. C. at the hospital, Tudor was arrested. Donnelle Tudor then contacted the father of R. H., another young girl whom she babysat. The father subsequently asked R. H. if Tudor had ever "played" with her. The child declined to answer the question at the time. Later that day, however, R. H. volunteered to her father that on at least one occasion she had been napping at the Tudor home and woke to find Tudor with his hand down her pants, fondling her buttocks. The father contacted the detective investigating the allegations of molestation relating to B. C., and the detective arranged for a forensic interview of R. H.. During that interview, R. H. repeated her account of how Tudor had molested her. A recording of that interview was introduced into evidence at trial and played for the jury.

The State also introduced similar transaction evidence which showed that approximately ten years earlier Tudor had been accused of and investigated for sexually molesting his great-niece, C. K.[4] Specifically, the evidence showed that Donnelle Tudor babysat C. K. five days a week, in the Tudor home, for a period of approximately four to six months. On the day in question, Donnelle went to the store and left C. K., who was then seven years old, in the care of Tudor. Tudor told C. K. to stand in front of him and when she did so, he unzipped her pants, placed his hands beneath her underwear, and fondled her vaginal area and her buttocks. Tudor then told C. K. not to tell anyone what had happened.

Tudor testified in his own defense at trial and denied all of the allegations against him.

Based on this evidence, the jury found Tudor guilty. On appeal, he contends that the evidence does not support the jury's verdict.

1. Tudor contends that the evidence is insufficient to support his convictions for aggravated sexual battery and child molestation, because the physical evidence

---

[4] The evidence at trial indicated that this case was never indicted or prosecuted because C. K.'s family moved out of the county and could not be located.

presented by the State to support these allegations was "inconclusive." This argument is devoid of merit.

Physical evidence of a sexual battery or molestation of a child is not necessary to obtain a conviction for either of those crimes. See, e.g., *Lee v. State*, 306 Ga. App. 144, 145 (1) (701 SE2d 582) (2010) (to sustain a conviction for aggravated sexual battery, "penetration of the victim's sexual organ need only be slight and a physical injury need not be shown") (citation omitted); *Dew v. State*, 292 Ga. App. 631, 633 (1) (b) (665 SE2d 715) (2008) ("a conviction for child molestation does not require a showing that the victim was touched beneath her clothing") (citation, punctuation and footnote omitted). Moreover, in determining whether the evidence suffices to sustain a conviction, our review is not limited to the physical evidence presented. Rather, "we ask whether, after viewing [all of] the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Citation and punctuation omitted.) *Louisyr v. State*, 307 Ga. App. 724, 727-728 (1) (706 SE2d 114) (2011).

Here, the evidence presented included physical evidence of trauma to B. C. that was consistent with both aggravated sexual battery and molestation. That physical evidence, together with the consistency of the victims' statements to the outcry

6

witnesses, law enforcement, and the forensic interviewer, the similar transaction testimony, and the evidence showing opportunity, sufficed to establish each element of the charges of aggravated sexual battery[5] and child molestation.[6] See *Inman v. State*, 295 Ga. App. 461, 464-465 (2) (671 SE2d 921) (2009) ("[e]vidence that appellant's finger penetrated the sexual organ of the victim was sufficient for the jury to find beyond a reasonable doubt that appellant committed an act of aggravated sexual battery") (citation and punctuation omitted); *Howard v. State*, 268 Ga. App. 558, 559 (602 SE2d 295) (2004) (evidence, which included victim's consistent statements to multiple persons about the defendant's molestation of her and injuries consistent with molestation sufficed to find defendant guilty of child molestation and aggravated child molestation). And although Tudor testified that he did not commit the charged offenses, the jury was not required to believe his testimony. "As we have explained before, it is the role of the jury to resolve conflicts in the evidence and to

---

[5] "A person commits the offense of aggravated sexual battery when he or she intentionally penetrates with a foreign object the sexual organ or anus of another person without the consent of that person." OCGA § 16-6-22.2 (b).

[6] A person commits the offense of child molestation when he "[d]oes any immoral or indecent act to or in the presence of or with any child under the age of 16 years with the intent to arouse or satisfy the sexual desires of either the child or the person." OCGA § 16-6-4 (a) (1).

7

determine the credibility of witnesses, and the resolution of such conflicts adversely to the defendant does not render the evidence insufficient." (Citation and punctuation omitted) *Heidt v. State*, ___ Ga. ___ (1) (Case No. S12A1430, decided January 7, 2013).

2. Attempting to expand the application of the Georgia Supreme Court's decision in *Garza v. State*, 284 Ga. 696 (670 SE2d 73) (2008)[7], regarding kidnapping offenses, Tudor argues that the evidence against him failed to satisfy the asportation element required for enticing a child for indecent purposes. We disagree, noting that enticing a child for indecent purposes is a markedly different crime from kidnapping.

Under Georgia law, "[a] person commits the offense of enticing a child for indecent purposes when he or she solicits, entices, or takes any child under the age of 16 years to any place whatsoever for the purpose of child molestation or indecent acts." OCGA § 16-6-5 (a). Both this Court and the Georgia Supreme Court have held that the element of "soliciting, enticing, or taking" of a child requires asportation – i.e., to satisfy this element of the crime, the evidence must show some movement of or by the child. See *Cimildoro v. State*, 259 Ga. 788, 789 (1) (387 SE2d 335) (1990);

---

[7] The actual holding of *Garza* was superseded by the legislature's subsequent amendment to the kidnapping statute, OCGA § 16-5-40, which became effective on July 1, 2009. See *Hammond v. State,* 289 Ga. 142 (710 SE2d 124) (2011).

8

*Heard v. State*, 317 Ga. App. 663, 665 (731 SE2d 124) (2012). As Tudor concedes in his brief, evidence showing even slight movement of the victim will satisfy the asportation element of enticing a child for indecent purposes. See *Moore v. State*, ___ Ga. App. ___(1) (Case No. A12A2419, decided February 5, 2013) (noting that "any evidence [of movement], no matter how slight, is sufficient to establish asportation") (citation omitted). See also *Hicks v. State*, 254 Ga. App. 814, 816 (2) (563 SE2d 897) (2002) (movement of child that occurred when defendant pulled the child toward him constituted asportation under OCGA § 16-6-5 (a)).

In *Garza*, the Georgia Supreme Court addressed the growing number of cases which relied on the principle that even slight movement of the victim satisfies the asportation element of the kidnapping statute, even though there had been no actual abduction or "stealing away" of the victim.[8] Under these cases, the Supreme Court noted, "almost any crime [during] which a victim moves [following their] initial

---

[8] For example, in *Garza* the defendant had broken into the victims' home and held them at gunpoint. The victims never left the residence, and the movement relied on by the State to establish kidnapping was the movement that occurred when one victim fell to the floor after being struck by the defendant and the subsequent movement of that victim from the floor to a chair. 284 Ga. at 696. The defendant had also moved the second victim from one bedroom to another in the family home. Id. The Georgia Supreme Court reversed the kidnapping convictions, finding that the movement in question was merely incidental to the crimes of aggravated assault and false imprisonment, of which the defendant had also been convicted. Id. at 701.

9

contact with the defendant would authorize a kidnapping charge." (Citation and punctuation omitted.) 284 Ga. at 699 (1). And, the court concluded, this "expansive construction of asportation distorts the purpose of the kidnapping statute and raises serious constitutional issues."[9] Id. Additionally, the *Garza* court also expressed its concern that "an expansive construction of asportation . . . effectively eviscerates the distinction between kidnapping and false imprisonment, the latter of which is treated by our statutory code as a serious crime but one that is far less serious than the crime of kidnapping." Id. at 700-701 (1). Thus, the Supreme Court concluded that to determine whether movement constitutes the asportation necessary for kidnapping, a court was to examine: "(1) the duration of the movement; (2) whether the movement occurred during the commission of a separate offense; (3) whether such movement

---

[9] The constitutional concerns noted by the *Garza* court included the fact that by interpreting the kidnapping statute so broadly, the courts created "the potential for cumulative punishment under more than one criminal statute for a single course of conduct, [thereby] implicat[ing] the principle of substantive double jeopardy . . . ." 284 Ga. at 700 (1). Additionally, convicting a person of kidnapping merely because they physically moved a victim during the course of an aggravated assault or a false imprisonment "poses a potential procedural due process problem." Id. "Though a person of ordinary intelligence would readily know that confining others against their will or committing armed robbery are acts which the law forbids, we are concerned that the plain language of the kidnapping statute may fail to provide fair warning that forcing the victims to move, however slightly, within the situs of the crime would justify prosecution for kidnapping." Id.

10

was an inherent part of that separate offense; and (4) whether the movement itself presented a significant danger to the victim independent of the danger posed by the separate offense." (Citation and footnote omitted.) Id. at 702 (1).

Relying on the rationale of *Garza*, Tudor argues that this Court should apply the four-part test set forth therein for the asportation element in the kidnapping context to the asportation element of enticing a child for indecent purposes. And under that test, he asserts, the movement of B. C. the short distance from the living room sofa to the kitchen table is insufficient so sustain his conviction for enticing a child for indecent purposes, because the movement was of short duration and because it was merely incidental to the crimes of aggravated sexual battery and child molestation.

We do not find Tudor's argument persuasive because it fails to acknowledge that, by design, the crimes of kidnapping and enticing a child for indecent purposes punish very different conduct. As demonstrated by the plain language of the kidnapping statute, it seeks to punish the "abduction" or "stealing away" of a person for any purpose whatsoever. Thus, the Georgia Supreme Court adopted the four-factor *Garza* test to:

> assist Georgia prosecutors and courts alike in determining whether the movement in question is in the nature of the evil the kidnapping statute was originally intended to address – i.e., movement serving to

11

substantially isolate the victim from protection or rescue – or merely a "criminologically insignificant circumstance" attendant to some other crime.

(Citation omitted.) Id.

While slight movement of a victim during the commission of some other crime may not represent the evil the kidnapping statute is designed to address, the same cannot be said for the slight movement of a child for indecent purposes. Indeed, the statute at issue is designed to punish any movement of a child, if that movement is for the purpose of sexually molesting, assaulting, or battering the child. Thus, the *Garza* court's particular concerns over the interpretation of asportation in the kidnapping context do not exist under OCGA § 16-6-5. In light of the specific purpose for which a child must be moved to prove enticing a child for indecent purposes, there is no danger that a violation of OCGA § 16-6-5 will be charged as a result of "any crime in which a [child] victim moves" following "the point of [his] initial contact with the defendant." *Garza*, 284 Ga. at 699 (1). Similarly, allowing only slight or minimal movement of the child to satisfy the asportation element of OCGA § 16-6-5 does not distort the purpose of that statute.

12

Moreover, the purpose of the enticing statute – which is to punish the movement of any child for the purpose of indecent acts against him – means that the movement it prohibits is, by definition, movement that presents "a significant danger to the victim independent of the danger posed by [any] separate offense." Id. at 702 (1). Finally, unlike a true kidnapping, the enticement of a child for indecent purposes will often be "incidental" to other crimes, including the crimes that were committed when indecent acts were committed against the child. The fact that asportation of a child might be incidental to the molestation of that child, however, does not mean that the movement of the child, standing alone, cannot constitute a separate offense. For these reasons, we decline to extend the rationale of *Garza* to OCGA § 16-6-5.

Turning now to the question of whether the movement of B. C. the short distance from the living room sofa to the kitchen table satisfies the asportation element required to sustain Tudor's conviction of enticing a child for indecent purposes, we find that it does. See *Whorton v. State*, 318 Ga. App. 885, 887 (1) (a) (735 SE2d 7) (2012) (evidence that defendant called victim to come from a different part of the house and into his bedroom, for the purpose of showing her pornography, satisfied the asportation element); *Hicks*, supra, 254 Ga. App. at 816 (2).

*Judgment affirmed. Miller, P. J., and Ray, J., concur.*

13