### A11A1077. TOLBERT v. THE STATE.
(720 SE2d 244)

DILLARD, Judge.

Following a trial by jury, David L. Tolbert was convicted of armed robbery, kidnapping with bodily injury, aggravated assault, aggravated battery, aggravated sodomy, and possession of a firearm during the commission of a felony. Tolbert challenges these convictions, arguing that the trial court erred in (1) denying his motion for discharge and acquittal pursuant to OCGA § 17-7-171, (2) applying an incorrect standard of review to his motion for new trial, (3) denying a motion for directed verdict as to the kidnapping-with-bodily-injury charge, (4) denying a motion for mistrial after a witness referenced the co-defendant's pretrial incarceration, (5) permitting the prosecution to speculate as to the whereabouts of the firearm during closing argument, and (6) excluding testimony that forensic evidence was misreported at a prior trial. For the reasons noted infra, we affirm Tolbert's convictions.

Viewed in the light most favorable to the jury's verdict,[1] the record shows that in the early morning hours of July 18, 2007, Tolbert and his co-defendant, Michael Willis, subjected two victims to a terrifying home invasion—for what turned out to be a fake lottery ticket.

Shortly before midnight on July 17, Brenda Rogers heard a noise outside the home and Kelvin Robinson decided to investigate. Upon exiting the home, Robinson was suddenly jumped by Willis, who had apparently been hiding behind Robinson's truck. Willis struck Robinson in the head with a gun and demanded money. Robinson responded that he did not have any money, but Willis insisted that he had been told otherwise.

During the ensuing struggle, a green Ford Explorer made its way up the road. Tolbert then jumped from the vehicle and twice struck Robinson on the back of the head with a knife. Both Tolbert and Willis had guns, and one of them again struck Robinson in the head with a firearm before pulling him into the house.

Meanwhile, unaware of what had just transpired outside, Rogers was in the kitchen when she noticed through her peripheral vision that a strange man (Tolbert) was inside the house. And when she

---

[1] *Powell v. State*, 310 Ga. App. 144, 144 (712 SE2d 139) (2011).

asked where Robinson was, Tolbert grabbed Rogers by the throat and said he would show her. Tolbert then proceeded to drag Rogers through the house to the living room, demanding to know where to find "the money," but Rogers did not know what Tolbert meant.

When they reached the living room, Rogers saw that Willis was holding Robinson at gunpoint, his bleeding head resting between his legs. Willis also used his knee to repeatedly strike Robinson in the face and ribs, proclaiming that he wanted to "put a cap in [Robinson's] ass" and that he "wasn't going to leave witnesses." As this continued, Tolbert pushed Rogers into a chair, took out a pair of latex gloves from a duffle bag, and then used his knife to tear apart sheets from Robinson's bed, the remnants of which Tolbert used to bind Robinson's hands and feet.

Willis, on the other hand, turned his attention to Rogers and demanded that she remove her panties and spread her legs. Fearing for her life, Rogers complied and begged the men not to kill her. Tolbert then approached Rogers, pulled her out of the chair by her throat, and made her lead him through the house in search of money. Rogers supplied Tolbert with a key to a safe kept in the bathroom, and she was then led back into the living room. Tolbert then retrieved Robinson and made him hop through the home to another room.

While Tolbert and Robinson were out of the room, Willis forced Rogers at gunpoint to perform oral sex on him. This assault ended when Tolbert returned and said that it was time to go, but Willis made Rogers follow them to the door. Once there, Willis pulled up Rogers's shirt and placed his mouth on her breasts before leaving the home. Rogers immediately shut and locked the door, watched Tolbert and Willis leave in the green Ford Explorer, and then freed Robinson, whose face was severely beaten and covered in blood.

Robinson and Rogers were unable to unlock the door to the home to escape because Tolbert had taken the keys. As a result, Rogers was forced to crawl through a window to call the police from a nearby home owned by Robinson's sister. Rogers scratched and bruised her legs while crawling through the window, and both she and Robinson spent the night at a hospital after law enforcement arrived. Rogers was examined by a sexual-assault nurse examiner, and Robinson was treated for a broken nose, cracked ribs, and multiple lacerations to his face and head.[2] While their victims were left with injuries, Tolbert and Willis made off with Robinson's cell phone, approximately $130 in cash, and a prank lottery ticket.

Because neither Robinson nor Rogers recognized the perpetra-

---

[2] Robinson testified at trial that since the attack, he has trouble walking and coughing, and that he still experiences pain as a result of the severe beating he endured.

tors, the police were left to piece together Tolbert and Willis's identities. The ensuing investigation revealed that prior to the robbery, Robinson kept the fake lottery ticket inside his truck. He would use the ticket, which he claimed to be a winner worth $10,000, to play practical jokes on his friends. And when questioned by law enforcement soon after the incident, Robinson recalled that a family friend, Kristian Kizziah, had been fooled by the ticket the day before the robbery.

The investigators thereafter discovered that Kizziah was a paramour of Willis. And at trial, Kizziah testified that she was shown the prank lottery ticket when she drove Robinson around town on July 16 and that she believed the ticket to be genuine. Later that night, she mentioned the ticket to Willis, and he asked to borrow her cell phone. Willis made a call, returned, asked Kizziah a few more questions regarding the ticket's appearance, and then stated that Tolbert was going to come over and that Kizziah should show them where Robinson lived. Kizziah then rode along with Tolbert and Willis in Tolbert's green Ford Explorer and, unsure of Willis's intentions, pointed out Robinson's home.

Tolbert and Willis then returned to Kizziah's home the next day with a duffle bag that contained latex gloves and masks. At that point, Kizziah finally surmised the duo's nefarious intentions but did not call the police.[3] Before the two men departed, Kizziah noticed a gun in Tolbert's waistband, and Willis borrowed a realistic-looking toy gun from her nephew. Kizziah was contacted by police the next day, but not before Willis called her to complain that the lottery ticket was fake and that they had beaten Robinson "for nothing."

For her part, Kizziah fully cooperated with law enforcement and explained that on the night of the robbery, Willis wore blue-jean shorts and a white shirt, and Tolbert wore a blue hat, camouflage pants, and a shirt with white writing. This description corroborated that given to the police by the victims.[4] And after Tolbert and Willis were apprehended, Rogers identified both in a photo line-up, and Robinson was able to identify Tolbert.[5]

Thereafter, Tolbert and Willis were indicted on one count of armed robbery,[6] two counts of kidnapping with bodily injury,[7] two

---

[3] Kizziah testified that although she had not been charged as a party to the crime, she had been informed by the State that she could still be charged as such.

[4] The victims also distinguished Willis from Tolbert through physical descriptions—Willis was short and heavyset while Tolbert was tall and skinny.

[5] Robinson testified that he was unable to identify Willis because he mostly remained behind Robinson, beating him about the face.

[6] OCGA § 16-8-41 (a).

[7] OCGA § 16-5-40 (a).

counts of aggravated assault,[8] three counts of aggravated battery,[9] one count of aggravated sodomy,[10] and one count of possession of a firearm during the commission of a crime.[11] Following a joint trial, the jury convicted both on all counts.[12] Tolbert was granted leave by the trial court to file an out-of-time motion for new trial, which the trial court ultimately denied. This appeal by Tolbert follows.

At the outset, we note that after a defendant has been convicted, "we view the evidence in the light most favorable to the jury's verdict, and the defendant no longer enjoys the presumption of innocence."[13] And we "do not weigh the evidence or determine witness credibility, but only determine if the evidence was sufficient for a rational trier of fact to find the defendant guilty of the charged offense beyond a reasonable doubt."[14] With these guiding principles in mind, we will now address each of Tolbert's enumerations of error in turn.

1. Tolbert first contends that the trial court erred in denying his motion for discharge and acquittal pursuant to OCGA § 17-7-171 by finding that his demand for a statutory speedy trial was struck.[15] Tolbert makes two arguments in this regard: (1) that because there was never a written order striking the demand, the State failed to try him within the time required by OCGA § 17-7-171; and (2) that the grounds for striking the demand were erroneous. Although we find the trial court's handling of Tolbert's speedy trial demand disconcerting, we nevertheless affirm its denial of his motion for discharge and acquittal.

Pursuant to OCGA § 17-7-171, "[a]ny person accused of a capital offense may enter a demand for a speedy trial at the term of court at which the indictment is found or at the next succeeding regular term thereafter; or, by special permission of the court, the defendant may at any subsequent term thereafter demand a speedy trial."[16] There-

---

[8] OCGA § 16-5-21 (a).

[9] OCGA § 16-5-24 (a).

[10] OCGA § 16-6-2 (a) (2).

[11] OCGA § 16-11-106 (a).

[12] Tolbert was convicted as a party to the crime of aggravated sodomy pursuant to OCGA § 16-2-20. Additionally, for purposes of sentencing, the count of kidnapping with bodily injury as to Robinson merged with two counts of aggravated battery against Robinson.

[13] *Powell*, 310 Ga. App. at 144.

[14] *Id.* (footnote omitted).

[15] The trial court also denied any claim to a violation of Tolbert's constitutional right to a speedy trial, but we do not address this issue because Tolbert does not challenge that aspect of the trial court's ruling on appeal. *See Campbell v. State*, 294 Ga. App. 166, 166 & n.1 (669 SE2d 190) (2008) (addressing appellant's challenge to denial of statutory speedy trial only because the denial of constitutional speedy trial was not at issue on appeal).

[16] OCGA § 17-7-171 (a); *see also Crawford v. State*, 252 Ga. App. 722, 723 (1) (556 SE2d 888) (2001) ("Although armed robbery is not a capital offense punishable by death, OCGA §

after, "[i]f more than two regular terms of court are convened and adjourned after the term at which the demand for speedy trial is filed and the defendant is not given a trial, then the defendant shall be absolutely discharged and acquitted of the offense charged in the indictment," so long as (1) juries were impaneled and qualified to try the defendant during both terms and (2) the defendant was "present in court announcing ready for trial and requesting a trial on the indictment."[17]

And here, the record shows that Tolbert was indicted on August 21, 2007, and that he filed a motion for a statutory speedy trial pursuant to OCGA § 17-7-171 on October 26, 2007.[18] This was followed by a motion to sever his trial from that of Willis in November 2007. At a hearing before Judge Nunn,[19] Willis's counsel sought a continuance from the December trial calendar, and Tolbert's trial counsel mentioned that he was experiencing some health-related problems and that he might or might not be available for trial in December. Nevertheless, counsel was adamant that Tolbert did not wish to withdraw his speedy-trial demand. The hearing ended without a ruling on any matter and with Tolbert's counsel informing the court that he would know the following day whether he would be available for trial in December.

What occurred thereafter is not entirely clear from the record, which is riddled with references to untranscribed rulings, events, and hearings (which apparently caused a great deal of confusion even for the trial court as it parsed through the procedural history of this case from time to time). What is known is that Tolbert and Willis were scheduled for trial in January 2008, but counsel for Willis was permitted to withdraw from representation at the last minute, and the trial court and State again declined to sever the defendants' trials. Thus, the case was removed from the January trial calendar and continued, so as to allow Willis to obtain new counsel. In February 2008, Tolbert filed a motion to dismiss, citing his speedy-trial demand.[20] But when the parties appeared for a hearing on the

---

17-7-171 and not OCGA § 17-7-170 is the statute that applies to that offense." (citation omitted)).

[17] OCGA § 17-7-171 (b).

[18] Pursuant to OCGA § 15-6-3 (21), the Superior Court of Houston County operates under four three-month terms of court: January–March, April–June, July–September, and October–December. Thus, Tolbert filed his motion in the next succeeding regular term after the issuance of the indictment against him, and he thereafter had two additional terms in which to be tried (the January term and the April term). *See* OCGA § 17-7-171 (a), (b).

[19] We briefly note that the record reflects somewhat sporadic involvement by three judges in the Houston Judicial Circuit—Judges Nunn, McConnell, and Lumsden. To avoid any confusion in setting forth the procedural history required to address this enumeration of error, we will refer to the judges by name.

[20] We note that if Tolbert intended for this motion to serve as a motion for discharge and

motion before Judge McConnell, the State volunteered that Tolbert's speedy-trial demand had been struck by Judge Nunn due to his defense counsel's illness.[21] The next day, the parties again appeared before Judge McConnell, and Tolbert's counsel admitted that Judge Nunn had indeed struck Tolbert's speedy-trial demand. Specifically, Tolbert's counsel expressed the following:

> On behalf of my client, there is a problem. And that problem is[ ] that there is no longer officially a Speedy Trial Demand. And[ ] if [Willis] never acts and the State never blinks about the severance issue, my client never goes to trial. So, in other words, we're in a total stalemate at this point and Your Honor, . . . I'm not trying to be inappropriate[.] I'm trying to express to the [c]ourt what our dilemma is because[ ] my client asked me a very simple question yesterday, which I didn't have a chance to answer. He asked me, ["I]s the Speed[y] Trial Demand we filed in November or October still in effect[?"] Answer, ["]No.["] And the reason is, because Judge — and you may not know this Judge, but I wanted to put it on the record[.] Judge Nunn ruled that, because I was ill in December, which was the first term of court available for Mr. Tolbert and Mr. Willis, that he was going to continue the case but he was gonna take away my Speedy Trial Demand. And as a result of that, I talked to the district attorney and he said, ["D]on't worry about that[.] [W]e're just gonna act as if it is, even though that it's not there[."] [A]nd true to his word we were ready to try thirty days later in January. And that's when the record is now back to what happened yesterday, on the record, where Your Honor explained what happened in January. But, I'm very alarmed with the prospect now that the co-defendant, basically, can call [Tolbert's] fate indefinitely.

Tolbert himself then spoke up to explain that he had been unaware that his speedy-trial demand had been struck.

Again, due to gaps in the record, what happened next is not entirely clear; but in March 2008, Judge Lumsden granted a request by Tolbert to file an out-of-time trial demand. And despite some confusion with regard to when the request was filed,[22] it is clear from

---

acquittal, it would have been prematurely filed. *See* OCGA § 17-7-171 (b).

[21] It is wholly undisputed that the speedy-trial demand was struck off the record and was done without a written order. The State's reference to the demand being struck is, therefore, the first instance in which this ruling is mentioned in the record.

[22] According to the order, Tolbert made the request "on or about February 22, 2008." The

the record that Tolbert sought permission to file an out-of-time speedy trial demand and that his request was granted. Tolbert, however, never actually filed an out-of-time speedy trial demand after the court granted his request.

Thereafter, until the State ultimately obtained a conviction in November 2009 (following a change in Tolbert's counsel and two separate mistrials brought on by the State in August 2008 and December 2008), Tolbert continued to assert his right to a statutory speedy trial through various motions to dismiss, always referencing the demand he filed in October 2007, but these motions were denied. And following his conviction, on motion for new trial, Tolbert argued that the State failed to establish that he had ever waived his right to a statutory speedy trial and that the trial demand had expired in June 2008.[23]

The trial court denied Tolbert's motion for new trial, which it treated as "a properly raised Motion for Discharge and Acquittal." In doing so, the court found that Tolbert made a proper speedy-trial demand in October 2007 pursuant to OCGA § 17-7-171 but that, despite Tolbert's arguments to the contrary, the demand had been struck. The court further found that Tolbert failed to file an out-of-time speedy trial demand, even though he had been granted permission to do so. Accordingly, the court found no violation of Tolbert's statutory speedy trial right.

Given the foregoing, we conclude that the trial court did not err in denying Tolbert's motion for discharge and acquittal. Although we are troubled by the manner in which the trial court struck Tolbert's speedy-trial demand (especially off the record),[24] and while we are

---

record reveals that a motion was signed by counsel on February 22, 2008, but was not filed until March 12, 2008, the same day that Judge Lumsden granted Tolbert's motion, which asked the court "to exercise its discretion to grant him an out of time speedy trial demand under the provisions of [OCGA §] 17-7-170 et seq."

[23] Tolbert further asserted that his right to a constitutional speedy trial had been violated but, again, the trial court's ruling on this issue has not been raised in this appeal.

[24] We note that because the exchange between Tolbert's counsel and Judge Nunn occurred off the record, we cannot determine whether a continuance was granted at counsel's request or whether Judge Nunn continued the case sua sponte. *See Rice v. State*, 264 Ga. 846, 847 n.2 (452 SE2d 492) (1995) ("[A] continuance . . . entered sua sponte by the trial court will not operate as a waiver on the part of the defendant."). *Compare id.* at 847 ("[A]ny continuance granted at the defendant's request will operate as a waiver of a speedy trial demand under OCGA § 17-7-171[.]"), *with id.* at 849 (Carley, J., concurring specially) ("[I]f a defendant in a capital case makes a demand for speedy trial and, subsequently, is granted a continuance which expires during the same term at which his demand was made, he can nevertheless insist that he be tried at either of the two regular terms of court following the term in which the demand was made. In such a situation, the grant of defendant's request for a continuance would not waive his right to seek discharge and acquittal if he were not tried at the two regular terms of court which were 'convened and adjourned after the term' during which he made his demand for speedy trial[.]"), *and Davis v. State*, 221 Ga. App. 168, 170 (1) (471 SE2d 14) (1996) (noting the concerns addressed in Justice Carley's concurrence in *Rice*).

likewise troubled by the apparent lack of notice to Tolbert (either due to the trial court, or his counsel at that time, or both),[25] the actions of Tolbert's counsel at that time confirm that the demand was indeed struck. And despite the trial court's subsequent grant of permission to file an out-of-time speedy trial demand (presumably as a curative measure), Tolbert inexplicably failed to do so.[26] In acknowledging this, we pause to note that although Tolbert alleged in his motion for new trial that "[p]revious counsel failed to properly enforce the speedy trial demand," he does not assert a claim of ineffective assistance of trial counsel on appeal.[27]

As we see it, Tolbert had at least two options with regard to his speedy-trial demand: (1) challenge the trial court's decision to strike his original speedy-trial demand and/or (2) request permission to file an out-of-time demand. Tolbert, through his counsel, only chose the latter option.[28] By acquiescing in the trial court's action of striking his October 2007 statutory speedy-trial demand (as evinced by counsel's commentary at the February 2008 hearing, noted supra), Tolbert abandoned any arguments with regard to it, and his failure to file an out-of-time demand after having been granted permission to do so constituted a waiver.[29] Therefore, the trial court properly denied Tolbert's motions to dismiss and his motion for discharge and

---

[25] *See In the Interest of Z. K.*, 285 Ga. App. 150, 150-51 & n.2 (645 SE2d 637) (2007) (physical precedent only) (collecting citations in support of proposition that the waiver of a statutory right, rather than constitutional, must be knowing, intelligent, and voluntary), *disapproved of on other grounds by In the Interest of J. M. B.*, 296 Ga. App. 786, 789 (676 SE2d 9) (2009).

[26] *See Smith v. State*, 261 Ga. 298, 300 (2) (404 SE2d 115) (1991) ("While a trial court can grant a defendant special permission to file an out-of-time demand for speedy trial, a trial court cannot actually make that demand for defendants.").

[27] *Compare Crawford v. Thompson*, 278 Ga. 517, 519, 520 (603 SE2d 259) (2004) (holding that defendant was entitled to habeas relief because his trial counsel was ineffective by failing to comply with the strict requirements of OCGA § 17-7-171 and that the defendant was thereby prejudiced, and further holding that defendant was also prejudiced by appellate counsel's failure to raise ineffective assistance of counsel argument on appeal).

[28] *See Burdett v. State*, 285 Ga. App. 571, 573 (2) (646 SE2d 748) (2007) (holding, despite argument by defendant that he was unaware that his counsel withdrew a demand for speedy trial, that "[i]t is a basic tenet of our judicial system that a trial court is entitled to rely on pleadings filed by an attorney on behalf of his client, and to presume that the client is aware of and consents to such pleadings").

[29] *See Mize v. State*, 262 Ga. 489, 490-91 (2) (422 SE2d 180) (1992) (holding that defendant waived statutory right to speedy trial when, following dismissal of first demand, defendant "did not seek the trial court's permission to file a new demand for trial"); *see also Oni v. State*, 268 Ga. App. 840, 841-42 (602 SE2d 859) (2004) ("A defendant . . . may waive his statutory right to automatic discharge and acquittal by some action on his part or on the part of his counsel."). *Cf. Bromley v. State*, 259 Ga. 377, 379-80 (4) (380 SE2d 694) (1989) (holding that when defendant was offered but refused curative instructions after the trial court denied his motion for mistrial, he could not thereafter complain); *Matiatos v. State*, 301 Ga. App. 573, 574 (1) (688 SE2d 385) (2009) (holding that when trial counsel accepted trial court's curative instruction without objection and without renewing motion for mistrial, he waived any claim of error on appeal).

acquittal.[30]

2. Tolbert next argues that the trial court applied an incorrect standard of review to his motion for new trial. We disagree.

Specifically, Tolbert contends that the trial court applied an improper standard of review when it denied his motion for new trial by noting in its order that "the credibility of the witnesses is for the jury to decide."[31] However, the transcript for the motion-for-new-trial hearing shows that Tolbert argued that "the eye witnesses were not credible as a matter of law" for a variety of reasons. To this argument, the trial judge responded that "witness credibility is a jury issue and is not gonna really be the basis for the grant of the Motion for New Trial, unless they were just way in left field," which the trial judge apparently did not believe was the case. Thus, contrary to Tolbert's argument, the judge's statements on the record establish that she did not apply an erroneous standard of review; she instead acknowledged that she would not usurp the jury's role as factfinder unless it was strongly against the weight of the evidence.[32]

3. Tolbert also argues that the trial court erred in denying his motion for a directed verdict on the counts of kidnapping with bodily injury, arguing that the element of asportation was not proven. Specifically, Tolbert contends that the movement of Robinson and Rogers was incident to the armed robbery and insufficient to satisfy the element of asportation. We disagree.

Under Georgia law, a person commits the crime of kidnapping when he "abducts or steals away [i.e., asports] another person without lawful authority or warrant and holds such other person against his or her will."[33] At the time of Tolbert's crime in 2007, "the law permitted the necessary element of asportation to be proven by

---

[30] We leave for another day the question of what arguments a defendant would preserve by explicitly objecting to the treatment of a prior speedy-trial demand while simultaneously requesting permission to file an out-of-time demand.

[31] *Compare Alvelo v. State*, 288 Ga. 437, 439 (704 SE2d 787) (2011) (vacating and remanding to trial court when it appeared that "it explicitly declined to consider the credibility of witnesses" and thus "failed to apply the proper standard in assessing the weight of the evidence" in defendant's motion for new trial).

[32] *See* OCGA § 5-5-21 ("The presiding judge may exercise a sound discretion in granting or refusing new trials in cases where the verdict may be decidedly and strongly against the weight of the evidence even though there may appear to be some slight evidence in favor of the finding."); *see also Infinite Energy, Inc. v. Ga. Public Serv. Comm'n*, 257 Ga. App. 757, 759 (1) (572 SE2d 91) (2002) ("The trial judge is presumed to know the law and presumed to faithfully and lawfully perform the duties devolving upon it by law. This [C]ourt will not presume the trial court committed error where that fact does not affirmatively appear." (footnote and punctuation omitted)).

[33] OCGA § 16-5-40 (a); *see also* OCGA § 16-5-40 (d) (4) ("A person convicted of the offense of kidnapping shall be punished by . . . [l]ife imprisonment or death if the person kidnapped received bodily injury.").

any evidence that the victim was moved, however slight."[34] In *Garza v. State*,[35] however, almost exactly one year before Tolbert's conviction, "our Supreme Court adopted a new four-part test to aid in the determination of whether the movement at issue constitutes asportation. . . ."[36] This test looks to

> (1) the duration of the movement; (2) whether the movement occurred during the commission of a separate offense; (3) whether such movement was an inherent part of the separate offense; and (4) whether the movement itself presented a significant danger to the victim independent of the danger posed by the separate offense.[37]

In adopting this test, the Supreme Court in *Garza* explained that its purpose in doing so was to assess

> whether the movement in question is in the nature of the evil the kidnapping statute was originally intended to address — i.e., movement serving to substantially isolate the victim from protection and rescue — or merely a criminologically insignificant circumstance attendant to some other crime.[38]

Here, we conclude that Tolbert's act of grabbing Rogers by the throat and pulling her from the kitchen into the living room was sufficient evidence of asportation to support his conviction.[39] Additionally, Tolbert and Willis's act of dragging Robinson inside the home to resume his beating was sufficient evidence of asportation to support Tolbert's conviction.[40] In both instances, although the duration of the movement was brief, each act allowed Tolbert and Willis to control their victims without interference, further isolating them from rescue and increasing the risk of harm.[41] Indeed, when Robinson was brought

---

[34] *Hall v. State*, 308 Ga. App. 858, 861 (709 SE2d 348) (2011) (footnote omitted).

[35] 284 Ga. 696 (670 SE2d 73) (2008).

[36] *Hall*, 308 Ga. App. at 861.

[37] *Garza*, 284 Ga. at 702 (1) (citation and footnote omitted).

[38] *Id.* (citation and punctuation omitted).

[39] *See Hammond v. State*, 289 Ga. 142, 145 (710 SE2d 124) (2011) (holding that there was sufficient evidence of asportation when victim was moved from room to room inside home); *Henderson v. State*, 285 Ga. 240, 245 (5) (675 SE2d 28) (2009) (same).

[40] *See Curtis v. State*, 310 Ga. App. 782, 786 (1) (714 SE2d 666) (2011) (holding that there was sufficient evidence of asportation when defendant dragged the victim inside the home to reinitiate the victim's beating); *Hall*, 308 Ga. App. at 861-62 (holding that there was sufficient evidence of asportation when defendant attempted to force victim into a bathroom stall and prevented others from rendering assistance).

[41] *See generally Curtis*, 310 Ga. App. at 786 (1); *Hall*, 308 Ga. App. at 862 (1).

inside the home, he was tied to a chair and subjected to further physical abuse. As for Rogers, after she was brought into the living room, Willis eventually demanded that she undress and forced her to perform oral sex on him. Therefore, the movements were not "merely a criminologically insignificant circumstance attendant to some other crime,"[42] but were instead representative of the "evil" that the kidnapping statute was designed to address.[43]

4. Additionally, Tolbert argues that the trial court erred in denying his motion for mistrial when Robinson referred to Willis's pretrial incarceration. We disagree.

At the outset, we note that "[t]he decision to deny a mistrial is within the trial court's discretion, and we will not reverse it unless the grant of a mistrial is necessary to preserve the right to a fair trial."[44] And "[i]n reviewing the trial court's decision, this court may consider the nature of the statement, the other evidence in the case, and the court's and counsel's action in dealing with the impropriety."[45]

Here, Tolbert moved for a mistrial when, during Willis's cross-examination of Robinson, counsel asked Willis to stand and for Robinson to describe Willis's height. To this question, Robinson responded, "Well now, people grow over two and a half years, especially when you're incarcerated." Willis's counsel immediately objected, the jury was removed from the courtroom, Willis moved for a mistrial, and Tolbert joined Willis's objection and motion. Thereafter, the trial court decided that it would provide a curative instruction to the jury with regard to Willis but that it would not include Tolbert in this instruction. Tolbert objected to this ruling, but the trial court explained that "because the question was specifically directed at Mr. Willis, that there's no real inference to Mr. Tolbert."

On appeal, Tolbert argues that Robinson's use of the word "you" is a plural pronoun and that the trial court's curative instruction negatively implicated Tolbert when it ordered the jury to disregard

---

[42] *Garza*, 284 Ga. at 702 (1) (citation and punctuation omitted).

[43] We note that Tolbert requested that the trial court *not* instruct the jury on false imprisonment as a lesser-included offense of kidnapping. *Compare Curtis*, 310 Ga. App. at 787 (2) (ultimately reversing kidnapping conviction because there existed evidence from which the jury could have convicted defendant of lesser-included offense and trial court failed to so instruct); *Hall*, 308 Ga. App. at 863 (2) (same).

[44] *McCain v. State*, 292 Ga. App. 886, 887 (665 SE2d 912) (2008) (footnote and punctuation omitted); *see also Jones v. State*, 279 Ga. App. 139, 140 (2) (630 SE2d 643) (2006) ("We review a trial court's denial of a motion for a mistrial based on the injection of improper character evidence for manifest abuse of the court's discretion." (citations and punctuation omitted)).

[45] *Jones v. State*, 251 Ga. App. 285, 287 (2) (a) (554 SE2d 238) (2001) (footnote omitted).

the statement as to Willis only. We disagree, and find no abuse of discretion by the trial court in denying Tolbert's motion for mistrial or curative instruction. It is clear from the transcript that Robinson's testimony was in response to a question by Willis's counsel regarding Willis's height and that it did not implicate Tolbert. Accordingly, the trial court did not abuse its discretion in declining to include Tolbert in its curative instruction.[46]

5. Next, Tolbert argues that the trial court erred when it permitted the State to speculate during closing argument that there was no gun in evidence because the defendants disposed of the weapon. We disagree.

The record shows that during closing argument, both Tolbert and Willis's counsels highlighted flaws in the State's evidence. Particularly, Willis's counsel argued, "No gun recovered. No fake guns recovered. No evidence that a gun was even used or here or anything like that, even though they purport to have a weapon of some sort, somewhere in evidence." On rebuttal, the State's prosecutor responded to the attacks on the evidence and, with regard to the issue of a gun, replied, "No gun. . . . Well, why no gun? Well, because the Defendants got rid of it. We don't have the gun." Both defendants immediately objected, and Tolbert argued that there was "[n]othing in evidence supporting that statement." The trial court, however, overruled the objection, finding that it was a "reasonable inference" and that "the jury may rely on their recollection about what the testimony was."

On appeal, Tolbert argues that the State's argument was prejudicial and inflammatory, requiring a curative instruction or mistrial pursuant to OCGA § 17-8-75.[47] But although counsel "should not be permitted in argument to state facts which are not in evidence, it is permissible to draw deductions from the evidence; and the fact that the deductions may be illogical, unreasonable, or even absurd, is matter for reply by adverse counsel, and not for rebuke by the court."[48] Here, the State's argument was clearly in rebuttal to

---

[46] *Cf. Moore v. State*, 310 Ga. App. 106, 108 (1) (712 SE2d 126) (2011) (holding that trial court did not abuse its discretion in denying mistrial when law enforcement officers testified to having a general familiarity with the defendant); *Jones*, 251 Ga. App. at 287 (2) (a) (holding that curative instruction was appropriate remedy when witness inadvertently referred to defendant's prior incarceration).

[47] *See* OCGA § 17-8-75 ("Where counsel in the hearing of the jury make statements of prejudicial matters which are not in evidence, it is the duty of the court to interpose and prevent the same. On objection made, the court shall also rebuke the counsel and by all needful and proper instructions to the jury endeavor to remove the improper impression from their minds; or, in his discretion, he may order a mistrial if the prosecuting attorney is the offender.").

[48] *Murphy v. State*, 203 Ga. App. 152, 154 (2) (416 SE2d 376) (1992) (citation and punctuation omitted); *see also Messick v. State*, 276 Ga. 528, 529 (2) (580 SE2d 213) (2003)

arguments made by the defendants,[49] and it sought to raise a possible explanation for the fact that no gun was entered into evidence.[50] Accordingly, it was not improper to suggest a conclusion the jurors themselves could have reached on their own.[51]

6. Finally, Tolbert argues that the trial court wrongly excluded testimony by an investigating officer that forensic evidence was misreported at one of the two prior trials that resulted in a mistrial. We disagree.

The record reflects that at Tolbert's first trial in August 2008, a law-enforcement officer who investigated the crime scene apparently testified that he had not created a report following his investigation. This trial eventually ended in a mistrial attributable to the State.[52] At Tolbert and Willis's second trial in December 2008, this investigator again took the stand; however, all parties were surprised when he testified to having created a report. At the defendants' request, the judge granted a mistrial because the investigator's testimony contradicted his prior testimony, and the investigator produced a report to which the parties had not been privy. The trial court also suggested that the sheriff's office conduct an internal investigation into the matter due to discrepancies regarding when the investigator claimed to have created the report.

Ultimately, the investigator was released from his service with the sheriff's office, and at the November 2009 trial, the State decided that it would not call the investigator as a witness. Both Tolbert and Willis expressed some desire to place the investigator on the stand

---

("Although it is improper for an attorney during closing arguments to introduce facts that are not in evidence, counsel may draw reasonable inferences or deductions from the evidence." (footnote omitted)).

[49] See *Johnson v. State*, 150 Ga. App. 405, 407-08 (3) (258 SE2d 22) (1979) (holding that State's argument was not improper when it "remarked upon a fact that was obvious to the jury" and that "[s]imilar comments had been stated in the negative by the defense in his closing argument," making the State's remarks "a form of rebuttal").

[50] See *Murphy*, 203 Ga. App. at 154 (2) (holding that State's suggestion that appellant drove a rental car "merely sought to raise possible explanations of the fact that the burglary car was not appellant's car, other than the conclusion that appellant could not have been the burglar if the car used by the burglar was not appellant's car").

[51] See *Perry v. State*, 232 Ga. App. 484, 487 (2) (c) (500 SE2d 923) (1998) (suggestion by State that defendants had committed crimes in the past and "were not amateurs" was "logically inferred from the evidence and within permissible bounds"). *Compare Bryant v. State*, 164 Ga. App. 543, 544 (3) (298 SE2d 272) (1982) (holding that State "strongly implied the existence of facts which were both prejudicial and not warranted by the evidence, viz, that the defendant intended to kill the FBI informant if he learned the informant's name and that, prior to his arrest for the offense for which he was on trial, the police had knowledge that he was a certain type of thief").

[52] The appellate record includes only three excerpts of witness testimony from this August 2008 trial, none of which reflect the testimony of this investigator and none of which reflect the reasons behind or the entry of the mistrial. Although this Court attempted to obtain same from the Superior Court of Houston County, we were unable to do so in a timely fashion.

and, because the State was unaware of the investigator's whereabouts or contact information, the court offered to help the defendants find the investigator and to issue a subpoena if necessary. At trial, Tolbert informed the trial court that he intended to call the investigator as a witness but said that he had been unable to contact the officer; however, there was no indication that either defendant ever accepted the court's offer of assistance in acquiring the investigator's testimony.

Thereafter, the State called as a witness the sergeant in charge of criminal investigations. When counsel for Willis cross-examined the sergeant, he began to inquire about procedural errors that were made during the course of the criminal investigation. The sergeant admitted that he was aware of "some errors in the crime scene processing." Counsel then proceeded to ask if the sergeant was referring to "[a] lack of procedural errors, a lack of following of procedure" by the crime-scene investigator who had previously testified, and the sergeant responded in the affirmative. Counsel then asked, "During the course of this case being investigated, having hearings and coming to trial, did you gain knowledge that there were reports inappropriately attached to your Investigative Report[?]" The State objected to this question.

The parties thereafter engaged in a bench conference and argued over whether asking the sergeant about what he had learned through the crime-scene investigator's prior testimony was hearsay. The State contended that because the investigator was not present to testify, the sergeant's response to the question would be hearsay. The court instructed the defendants that they were not to "get into the specifics of what [the investigator] did, [and] when, that was a violation of [crime-scene] procedure" with the sergeant and that they would need to call the investigator to pursue that line of questioning. The court did, however, believe that it would be proper to question the sergeant as to whether he was aware that crime-scene procedures were not followed as they should have been. The court then opined that "the question is, can [the sergeant] testify that he is aware that [the investigator] was untruthful on the stand or that he committed perjury or what have you."

The court then recessed to review the transcript of the investigator's prior testimony and offered for the record that after the entry of the mistrial in December 2008, the sheriff's department "apparently notified the District Attorney's Office that they did not believe the report had been created at the time [the investigator] testified to" but that "[a]t no time did [the investigator] actually admit that . . . [the report] was not created when he said it was created." Thus, the court ultimately ruled that there was no evidence presented in the current trial dependent upon the investigator's cred-

ibility and that "there has been no suggestion that he has manufactured evidence that implicates these Defendants, [or] that he has destroyed evidence that would exonerate these Defendants." Accordingly, the trial court determined that there was "nothing in this that bears directly on the question . . . [of] the guilt or innocence of the accused." The court, therefore, sustained the State's objection to questioning whether the investigator perjured himself and instructed the defendants that if they wished to call the investigator, it could not be for the sole purpose of discrediting him, and that the issue was one of relevance.

On appeal, Tolbert argues that the trial court erred in sustaining the State's objection because Willis's counsel "was seeking information about [the sergeant's] knowledge of the investigative procedures" and that "any irregularities in the crime scene procedures and the reporting thereof were fair game." But the record reflects that the trial court did *not* preclude either Willis or Tolbert from this line of questioning. Indeed, the trial court even instructed the defendants that

> [o]ther than [that] the procedures were not followed, which [the sergeant has] already said, . . . and if he has direct knowledge of something [the investigator] did or didn't do, or he asked [the investigator] to do and it wasn't done or whatever, I'll let you go there, but with regard to allegations of perjury [by the investigator], I don't see how that comes in at this point.

Accordingly, Tolbert mischaracterizes the trial court's ruling and thus cannot blame it for any deficiencies in the sergeant's cross-examination. We further note that the trial court did not abuse its discretion in ruling that any inquiry into the investigator's prior testimony was irrelevant.[53]

Accordingly, for all the foregoing reasons, we affirm Tolbert's convictions.

*Judgment affirmed. Mikell, C. J., and Smith, P. J., concur.*

DECIDED NOVEMBER 16, 2011 —
RECONSIDERATION DENIED NOVEMBER 30, 2011 ▪

Armed robbery, etc. Houston Superior Court. Before Judge Lumsden.

---

[53] *See, e.g., Puckett v. State*, 310 Ga. App. 153, 154-55 (1) (712 SE2d 579) (2011) ("The trial court has broad discretion to exclude evidence on grounds of relevancy, and if the proffered evidence is too tenuous to prove the desired matter and is possibly more prejudicial than probative, the trial court does not abuse its discretion in excluding the evidence." (footnote and punctuation omitted)).

*Russell K. Walker*, for appellant.

*T. Rabb Wilkerson III, District Attorney, George H. Hartwig III, Daryl E. Manns, Assistant District Attorneys*, for appellee.