**THIRD DIVISION**
**ANDREWS, P. J.,**
**DILLARD and MCMILLIAN, JJ.**

**NOTICE: Motions for reconsideration must be**
***physically received* in our clerk's office within ten**
**days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules/**

**February 27, 2014**

# In the Court of Appeals of Georgia

A13A1857. SELLERS v. THE STATE.

MCMILLIAN, Judge.

Vernon Sellers was convicted by a jury of kidnapping with bodily injury, rape, aggravated sexual battery, aggravated assault and burglary. He appeals, contending that the evidence was insufficient to establish that he was the perpetrator of the crimes and, alternatively, that trial court should have granted his motion for new trial because the verdict was contrary to the weight of the evidence establishing his identity. See OCGA § 5-5-20.[1] Further, he argues that the evidence was insufficient

---

[1] As both appellate courts have explained, "'the sufficiency of the evidence standard and the discretionary standard given to the trial court pursuant to [OCGA § 5-5-20 and] OCGA § 5-5-21 address two distinct legal issues, illustrated by the fact that the double jeopardy clause applies when a court finds the evidence insufficient, but not when a court holds that the verdict was against the weight of the evidence.' *Walker* [*v. State*, 292 Ga. 262, 264, n. 2 (737 SE2d 311) (2013)]." *Neverson v. State*, 324 Ga. App. 322, 322 (1), n. 3 (750 SE2d 397) (2013).

to establish the asportation element of his kidnapping conviction. As more fully set forth below, we now reverse his conviction for kidnapping and affirm his convictions for the remaining offenses.

1. (a) We first consider the sufficiency of the evidence to establish Sellers's identity as the perpetrator of the crimes.

> In doing so, we apply the familiar standard of *Jackson v. Virginia*, 443 U.S. 307 (99 SCt 2781, 61 LE2d 560) (1979), asking whether any rational trier of fact could find beyond a reasonable doubt from the evidence adduced at trial that [Sellers] is guilty of the crimes of which he was convicted. See 443 U.S. at 319 (III) (B). As to the legal sufficiency of the evidence, we view the evidence in the light most favorable to the verdict, and we put aside any questions about conflicting evidence, the credibility of witnesses, or the weight of the evidence, leaving the resolution of such things to the discretion of the trier of fact. See *Hayes v. State*, 293 Ga. 506, 506 (739 SE2d 313) (2013).

*White v. State*, 293 Ga. 523, 523 (1) (___ SE2d ____) 2013.

So viewed, the evidence showed that the victim of the crimes was a 69-year-old female who lived alone. The victim recently had been hospitalized, was in poor health and was dependent on oxygen to help her breathe. According to her testimony at trial and her recorded interview with police, which was played for the jury, the victim was

2

in her bedroom on the night of March 3, 2005, watching a DVD when she heard dogs barking and a noise outside a window in the adjacent bedroom. She knew the window in that bedroom did not lock and walked to the bedroom to investigate.[2] She did not see anyone outside the house or in the bedroom, but she sensed someone was there, and then realized that a man wearing a beige mask was standing in the bathroom.[3] The victim described the intruder as a black male, around six feet in height, wearing denim blue jeans, a lightweight dark jacket, and dark colored athletic shoes with white stripes on the sides.

The man told the victim to go back into the other bedroom and asked her to tell him her name, which she did. He pushed her into her bedroom, turned off the DVD, which was the only source of light in the room, and then pushed her down onto the bed and taped her eyes and mouth with duct tape. He told the victim to turn over and crossed her wrists behind her back and taped them together. Afterwards, the

---

[2] The victim's grandson, who lived with her until about two months before the incident, had removed the lock while he lived there, and it had never been replaced.

[3] Testimony was presented indicating that this appeared to be the "master" bedroom, although it was not the one the victim used, and that there was a bathroom inside the bedroom. There was also another bathroom in the hallway right outside this bedroom and the victim's bedroom, and the evidence presented at trial was somewhat unclear concerning whether the victim encountered the perpetrator in the "master" bathroom or the "hallway" bathroom.

perpetrator pulled off the victim's underwear, tore off her gown, put his finger into her vagina, put his mouth on her breasts, and then raped her.

Although her eyes were still taped, the victim said she was partially able to see her attacker by holding her head a certain way and looking under the tape. Thus, she testified that after he raped her, the perpetrator got up and walked to the hallway bathroom located next to the victim's bedroom. He returned to the bedroom with a washcloth, washed the inside of the victim's vagina and her breast area, and then turned her over and washed her buttocks. He went back into the bathroom, came back with the washcloth, and washed the victim again. He then made the victim stand, took the linens off the bed, and stuffed them into a light-colored bag. He also cleaned a portion of the carpet located beside the bed.

After he finished cleaning up, the perpetrator placed the victim, who was still bound, back on the bed and walked out of the room with the linens.[4] He subsequently reentered the room, told the victim to shut up and placed a knife on each side of the victim's neck. He then walked out of the room again.

---

[4] The victim's neighbor testified that on the night of the crimes he heard dogs barking at about 12:00 a. m. to 12:30 a. m. and when he went outside to investigate he saw a black man at the corner of his fence holding two white garbage bags. The neighbor walked around the corner of the bushes in his yard and the man turned and walked the other way.

4

When he did not return after a while, the victim called out to see if he would answer her. When she did not get an answer, she got up off the bed and went into the living room, where she turned on a light. She tried to hold the phone but dropped it and then tried to cut the tape off her hands but could not do that either. She checked the door to the carport and noticed it was unlocked and locked it back. After about an hour, the victim was able to remove some of the tape from her hands and to call her son and the police.

A Houston County emergency call dispatcher testified she received a 911 call from the victim at about 1:38 a.m. on March 3, 2005. The victim, who was upset and crying, said she had been raped. She told the dispatcher that the perpetrator had also held a knife to her throat, that he did not wear gloves, and that he had cleaned up after the attack. She described him as a tall black man and said she did not think it was someone she knew.

Jeff Herb of the Warner Robins Police Department responded to the call and went to the victim's home. He testified that the victim had duct tape around one hand, bruising around her wrist, and blood on her hand. He said the victim was very upset and told him she had been raped, as well as other details about the attack. The victim described her attacker as being a black male, and, based on a comparison with the

5

officer's height, between 6' 3" and 6' 5" tall. When asked his weight, she turned to her son, who was also present by that time, and said that he was about "Vernon's size," referring to the defendant, who was married to her granddaughter Melissa Sellers. She also told Officer Herb her attacker was wearing a beige ski mask that concealed his entire face except for his eyes; denim colored blue jeans; a dark, lightweight jacket and black athletic shoes with a white stripe on the side. On cross-examination, Herb said that it did not seem like the victim knew her attacker.

After she talked to police, the victim was transported to the hospital where she was examined by a nurse specially trained to conduct sexual assault examinations. The nurse testified that the victim had extensive abrasions and bruising all over her body, as well as injuries to her vagina and genital area that the nurse said were consistent with what the victim told her about the assault and rape, including that the perpetrator had washed the inside of the victim's vagina with a washcloth. Pictures of the victim's injuries were also introduced, over objection, into evidence at trial.[5]

The victim's son also testified at trial. He said he went to the hospital with his mother, and, upon cross-examination by the defense, testified that his mother told him

---

[5] Because the victim was on Coumadin, which is a blood thinning drug, the bruising from the attack showed up more quickly than would normally be the case.

while they were at the hospital that the person who attacked her sounded like "Vernon." However, he said that he was not sure what his mother meant by the comment and explained that she did not say that Sellers was the perpetrator.

Multiple forensic experts also testified at trial. Lieutenant John Miller Lanneau, who was qualified as an expert in latent print examination and comparison and in crime scene investigation, testified that Sellers's fingerprint was found on a bottle of Lysol cleaner which was found sitting on the bathroom counter, which the victim said had been on the top bathroom shelf when she went to bed that night. Further, various experts testified that identifiable fingerprints were found on six pieces of the duct tape used to bind the victim, and one of those prints was a match to one of Seller's fingerprints. An expert in trace evidence, who examined certain shoe prints that were found in the victim's kitchen,[6] testified that "possibly" some of those prints had been left by two different pairs of shoes that police had obtained from Sellers; one pair of those shoes was black with a white stripe on the side.[7] The swabs obtained during the

---

[6] The victim found the carport door unlocked after the attack, and testified that caused her to believe that the perpetrator exited that way because she was sure it had been locked when she went to bed that night. Further, the evidence showed the perpetrator would have traversed the kitchen to leave through that door.

[7] The shoes were shown to the jury, and although they are not in the appellate record, during closing argument, the prosecuting attorney identified the shoes as

7

examination of the victim were also tested but did not reveal the presence of any semen.[8]

Also pertinent here, the evidence showed that Sellers, who, as stated above, was married to the victim's granddaughter Melissa, would often accompany his wife on her visits to her grandmother, but he usually waited in the car instead of going inside. The victim testified that on occasion Sellers did come inside, but primarily just to use the bathroom, and that she could remember that happening only twice in the past. Further, the victim testified that Melissa and other family members knew about the window in the bedroom that did not lock, but she did not know if Sellers knew the lock was missing.

Police interviewed Sellers on several occasions, and an officer testified about one of the interviews; the other was recorded and played for the jury. Sellers told police that he left his house around 11:30 p.m. on the night of the crimes because he and Melissa had been arguing, and he wanted to ride around and listen to music to calm down. He said that he drove around east Macon, but he did not talk to anyone

---

being black with a white stripe, and Sellers's attorney referred to "those black shoes."

[8] The victim told police in her recorded interview that she thought the perpetrator had on a condom.

who could verify his whereabouts during that time. Sellers could not say precisely what time he returned home but said it was probably around 12:30 to 1:00 a. m.[9] He told police that he sometimes accompanied his wife when she visited the victim's house, but he did not go inside the house often, although recently he had been going inside more often because the victim had been ill. Sellers admitted that he owned a beige knit cap and told police that he was wearing a blue and gray Chaps sweater and blue jeans when he left the house that night.

Melissa Sellers testified at trial as a defense witness. Melissa said that Sellers and she had argued the night of the crimes, he left the house around 11:00 p.m., and he returned home before 2:00 a.m., although she was not certain of the exact time he returned. She testified that Sellers was wearing a white t-shirt with a blue and gray sweater, dark jeans and Jordan athletic shoes when he left that night. She also said that Sellers owned a beige knit hat, but she was not able to find the hat or the sweater when the police requested it and the police did not find it when they searched the house where Sellers and she lived.

---

[9] One of the officer's testified that it took him about 11 minutes to drive from Sellers's house to the victim's house.

Melissa testified that just prior to the incident she had been spending a great deal of time with her grandmother, who had been sick. On those occasions, Sellers had been coming inside the house more than was his previous custom because they had a newborn, and he was helping her bring the children and their belongings into the house. She also testified that Sellers and she had borrowed duct tape from her grandmother in the latter part of 2004, but she had returned the duct tape prior to the incident. The victim also testified that Melissa and Sellers had borrowed duct tape in the past, and Melissa told her after the incident that she had returned the tape. However, the victim said that she could not remember if the tape had been returned, and she did not know if she had duct tape in her home the night of the incident.

"Circumstantial evidence of identity may be sufficient to enable a rational trier of fact to find a defendant guilty beyond a reasonable doubt." *Onumah v. State*, 313 Ga. App. 269, 272 (3) (721 SE2d 115) (2011). E.g., *Mays v. State*, 198 Ga. App. 402, 403 (3) (401 SE2d 597) (1991). Although Sellers presented evidence discounting the State's forensic evidence, such as the fact that he had been in the victim's home recently and that his fingerprints could have been placed on the tape when he

borrowed it, the jurors heard this and the other evidence introduced[10] at trial and were charged with resolving the conflicts in the evidence, determining the credibility of the witnesses, and weighing the evidence presented. Having considered the evidence recited above as well as other evidence presented at trial under the standard appropriate for our review, we find it sufficient beyond a reasonable doubt to prove that Sellers was the perpetrator of the crimes charged. *Jackson v. Virginia*, 443 U.S. 307 (99 SCt 2781, 61 LE2d 560) (1979).

(b) Sellers also argues that the trial judge failed to fulfill his duty to act as a thirteenth juror and should have set aside the verdict as being contrary to the weight of the evidence. See OCGA § 5-5-20.

Sellers specifically asserted in his motion for new trial that the verdict and sentence were contrary to the evidence, decidedly and strongly against the weight of the evidence and contrary to the law and principles of justice and equity. But at the

---

[10] This evidence includes Sellers's cross-examination of the victim, including his questioning of the victim about her statement during her interview with police that she did not believe Sellers was her attacker. However, she explained that she made that statement because she did not believe he would do anything like that, and she did not want to tell her granddaughter it was him unless she was sure. Further, she testified that her opinion had changed based on the evidence which was admitted at trial and other inadmissible evidence, as explained in a stipulation the trial court read to the jury, which stated that she now believed he could be the perpetrator, although she could not be certain.

hearing on his motion for new trial, Sellers's counsel made only a passing reference to the general grounds argument in the motion and went on to argue the sufficiency of the evidence, specifically requesting that the trial court rule on that basis. Nevertheless, in the order denying the motion for new trial, the trial court acknowledged Sellers's "claims that the verdict was contrary to – and against the weight of – the evidence" and found that "while the case against Defendant was indeed largely circumstantial, the proven facts were so numerous and compelling that the Court finds the evidence to have justified the verdict." This specific reference to Sellers's general grounds argument, coupled with the trial court's statements concerning the nature and quantum of the evidence, establish that the trial court did, in fact, consider whether the verdict was contrary to or against the weight of the evidence under the proper legal standard, and contrary to Sellers's contentions on appeal, properly fulfilled his role to sit as the thirteenth juror. Accordingly, "this is not a case where it is necessary for us to remand to the trial court for consideration of this issue under the proper standard." *Neverson v. State*, 324 Ga. App. at 322 (1), n. 2. *Tolbert v. State*, 313 Ga. App. 46, 53 (2) (720 SE2d 244) 2011). Cf. *White v. State*, 293 Ga. at 524-525; *Choisnet v. State*, 292 Ga. 860, 862 (742 SE2d 476) (2013); *Alvelo v. State*, 288 Ga. 437, 439 (1) (704 SE2d 787) (2011).

12

2. Sellers also argues that his conviction for kidnapping must be reversed because the evidence of asportation was insufficient under the test adopted by our Supreme Court in *Garza v. State*, 284 Ga. 696 (670 SE2d 73) (2008).[11] We agree.

*Garza* sets out the following four factors that should be considered in determining whether the asportation element of kidnapping has been shown:

> (1) the duration of the movement; (2) whether the movement occurred during the commission of a separate offense; (3) whether such movement was an inherent part of that separate offense; and (4) whether the movement itself presented a significant danger to the victim independent of the danger posed by the separate offense.

*Garza*, 284 Ga. at 702 (1), citing *Government of Virgin Islands v. Berry*, 604 F2d 221, 227 (IV), 16 V.I. 614 (3rd Cir. 1979).

---

[11] The crimes charged in this case occurred in March 2005, Sellers was tried and convicted in 2006, his motion for new trial, as amended, was denied in April 2013, and his notice of appeal was timely filed within thirty days of the order denying the motion. *Garza* applies retroactively to cases such as this in which the case was in the pipeline at the time of the decision. *Hammond v. State*, 289 Ga. 142, 143-144 (1) (710 SE2d 124) (2011); *Goolsby v. State*, 311 Ga. App. 650, 653 (1) (a) (718 SE2d 9) (2011). Further, although the kidnapping statute, OCGA § 16-5-40, was amended by the legislature to clarify the asportation requirement, the amendment applies only to cases involving crimes committed on or after July 1, 2009. *Holder v. State*, 319 Ga. App. 239, 241 (1) (a), n. 8 (736 SE2d 449) (2012).

13

In analyzing these factors, it is not necessary that every one be satisfied in the State's favor in order to find asportation. [Cits.] Rather, the heart of *Garza's* analysis is "whether the movement in question is in the nature of the evil the kidnapping statute was originally intended to address – i.e., movement serving to substantially isolate the victim from protection or rescue – or merely attendant to some other crime." [*Garza*, 284 Ga. at 702 (1).]

(Punctuation omitted.) *Arnold v. State*, 324 Ga. App. 58, 62 (2) (749 SE2d 245) (2013). See also *Hammond v. State*, 289 Ga. at 144 (2); *Henderson v. State.* 285 Ga. 240, 244-245 (5) (675 SE2d 28) (2009); *Tate v. State*, 287 Ga. 364, 365-366 (1) (a) (695 SE2d 591) (2010).

The evidence pertinent to this issue shows[12] that Sellers immediately ordered the victim to go back to her bedroom and pushed her a few steps in that direction. Both bedrooms were located off a short hallway at the back of the house and were closely situated. Thus, there is no question here that the distance the victim moved was short and the duration of the movement was brief. Further, once the victim was in her bedroom, Sellers immediately pushed her down on the bed, bound her, and

---

[12] We note that the law in existence at the time this case was tried required only slight movement of the victim to prove the asportation element of a kidnapping offense, and thus the evidence necessary to assess the *Garza* factors is not extensive or well developed.

began to sexually assault her. Because the evidence shows that the other bedroom was for the most part unfurnished,[13] it appears that Sellers may have moved the victim back to this bedroom so that he could place her on the bed for the purpose of binding and raping her. Accordingly, while the movement of the victim was not a necessary part of the sexual assault crimes, "it allowed [Sellers] to exercise control over [the victim] during his conduct of the rape and was, therefore, an inherent part of the rape." *Goolsby v. State*, 311 Ga. App. 650, 654 (1) (b) (718 SE2d 9) (2011). Also, because the victim was in the house alone and both bedrooms were located in the back of the house, the movement from one bedroom to another did not further isolate the victim or decrease the potential for rescue, thereby posing no significant danger to the victim independent of the danger posed by the sexual assault and rape. Id. Accordingly, Sellers's conviction for kidnapping must be reversed under the standard set forth in *Garza*. E.g., *Goolsby*, 311 Ga. App. at 653 (1) (b); *Moore v. State*, 301 Ga. App. 220, 228-229 (7) (b) (687 SE2d 259) (2009), and cites; *Escoffier v. State*, 303 Ga. App. 317, 318 (693 SE2d 569) (2010); compare *Arnold*, 324 Ga. App. at 62 (2);

---

[13] An officer testified at trial that this bedroom was "for the most part unoccupied by furniture or people," and a photograph of the room shows just a few pieces of furniture. We reiterate, however, that this evidence is not clear.

15

*Tolbert*, 313 Ga. App. at 55 (3); *Peralta v. State*, 312 Ga. App. 414, 416 (1) (718 SE2d 326) (2011).

*Judgment affirmed in part and reversed in part. Andrews, P. J., and Dillard, J., concur.*